**BARNES & THORNBURG LLP**
DAVID C. ALLEN (SBN 190479)
david.allen@btlaw.com
PETER MORRIS (SBN 126195)
peter.morris@btlaw.com
SETH A. GOLD (SBN 163220)
seth.gold@btlaw.com
GARRETT S. LLEWELLYN (SBN 267427)
garrett.llewellyn@btlaw.com
JONATHAN J. BOUSTANI (SBN 274748)
jonathan.boustani@btlaw.com
AMY C. POYER (SBN 277315)
amy.poyer@btlaw.com
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone:   (310) 284.3880
Facsimile:   (310) 284.3894

[Additional Counsel listed on Signature Page]

Attorneys for Plaintiffs
C.R. LAURENCE CO., INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.R. LAURENCE CO., INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>FRAMELESS HARDWARE COMPANY LLC, a Delaware limited liability company; CHRISTOPHER HANSTAD, an individual; JESUS "JESSE" DORADO, an individual, BARRY SUTHERLAND, an individual; GLASSWERKS LA, INC., a California Corporation; and, RANDY STEINBERG, an individual,<br><br>Defendants. | Case No. 2:21-cv-01334-JWH (RAOx)<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF FOR:**<br><br>(1) Violation of Computer Fraud & Abuse Act [18 U.S.C. §§ 1030 *et seq.*];<br>(2) Violation of Cal. Penal Code § 502;<br>(3) Patent Infringement [35 U.S.C. §§ 101 *et seq.*];<br>(4) Violation of Defend Trade Secrets Act, [18 U.S.C. §§ 1832 *et seq.*];<br>(5) Violation of California Uniform Trade Secret Act §§ 3426 *et seq.*;<br>(6) Violation of Lanham Act § 43(a) [15 U.S.C. § 1125(a)];<br>(7) Common Law Unfair Competition;<br>(8) Fraud;<br>(9) Breach of Contract; |

(10) Intentional Interference with
     Contract;
(11) Unjust Enrichment and Restitution;
     and
(12) Violation of Cal. Bus. & Prof. Code §
     17200

**[DEMAND FOR JURY TRIAL]**

## THIRD AMENDED COMPLAINT

Plaintiff C.R. Laurence Co., Inc. ("C.R. Laurence" or "CRL"), by and through its undersigned attorneys, hereby brings this action against Frameless Hardware Company LLC ("FHC"), Christopher Hanstad ("Hanstad"), Jesus "Jesse" Dorado ("Dorado"), Barry Sutherland ("Sutherland"), Glasswerks LA, Inc. ("Glasswerks"), and Randy Steinberg ("Steinberg") and alleges as follows:

## JURISDICTIONAL STATEMENT

1.     This Court has jurisdiction over the subject matter of this action pursuant to at least 28 U.S.C. § 1331 and § 1338(a) and supplemental jurisdiction over CRL's state law claims pursuant to at least 28 U.S.C. § 1367.

## PRELIMINARY STATEMENT

2.     CRL has become one of the architectural glass industry's leading sources for supplies and equipment through its decades-long effort at developing and maintaining confidential supplier information and relationships, designs and specifications, product design software programs, and other confidential information and intellectual property. CRL's proprietary designs, software, trade secrets, patents, and other intellectual property rights were (and are) critical to its business strategy.

3.     In April 2019, numerous former high-ranking CRL employees, including defendant Hanstad, formed defendant FHC to compete directly with CRL. While FHC boasts that it provides a legitimate option to CRL, nothing could be further from the truth. FHC's entry into the market has been based on offering products and services obtained through the theft of valuable CRL property. Among other things, FHC has been illegally accessing CRL's computer systems to use proprietary software programs to design and sell products to compete directly with CRL. In addition, FHC has infringed a CRL patent, misappropriated CRL's other trade secrets and intellectual property, and engaged in unfair competition. In short, FHC has brazenly broken the law to get a head start and to unlawfully compete against CRL in the marketplace.

4.     By this complaint, CRL seeks damages, an injunction, and other relief

1

pursuant to, inter alia, the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030 *et seq.*), the Patent Act (35 U.S.C. §§ 101 et seq.), the Defend Trade Secrets Act (18 U.S.C. §§ 1832 *et seq.*), the Lanham Act (15 U.S.C. §§ 1051 et seq.), California Penal Code §§ 502 *et seq.*, and the California Uniform Trade Secrets Act.

## **THE PARTIES**

5.     Plaintiff C.R. Laurence Co., Inc. is a California corporation that maintains its corporate headquarters and principal place of business in Los Angeles County, California.

6.     Defendant Frameless Hardware Company is a Delaware limited liability company that maintains its principal place of business in Los Angeles County, California.

7.     Defendant Christopher Hanstad is Frameless Hardware Company's Chief Executive Officer, who, on information and belief, resides in Los Angeles County, California.

8.     Defendant Jesus "Jesse" Dorado is an employee of Frameless Hardware Company, who, on information and belief, resides in Los Angeles County, California.

9.     Defendant Barry Sutherland is an employee and member of Frameless Hardware Company, who, on information and belief, resides in Los Angeles County, California.

10.     Defendant Glasswerks LA, Inc. ("Glasswerks") is California corporation that maintains its principal place of business in Los Angeles County, California.

11.     Defendant Randy Steinberg ("Steinberg") is the Chief Executive Officer of Glasswerks and, on information and belief, resides in Los Angeles County, California.

## **JURISDICTION AND VENUE**

12.     This action arises under the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030 *et seq.*), the Patent Act (35 U.S.C. §§ 101 *et seq.*), the Defend Trade Secrets Act (18 U.S.C. §§ 1832 *et seq.*), the Lanham Act (15 U.S.C. §§ 1051 *et seq.*), the California Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code §§ 502 *et seq.*),

the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426 *et seq.*), California Business and Professions Code § 17200 *et seq.*, and California common law.

13.     This Court has jurisdiction over the subject matter of this action pursuant to at least 28 U.S.C. §§ 1331 and 1338(a), and has supplemental jurisdiction over CRL's state law claims pursuant to at least 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over FHC and Glasswerks because their corporate headquarters and principal places of business are located in Los Angeles, California. The Court has personal jurisdiction over defendants Hanstad, Dorado, Sutherland, and Steinberg because, on information and belief, they each reside in Los Angeles County, California.

15.     Venue is proper in this Court in accordance with at least 28 U.S.C. § 1391(b)(1) and § 1391(b)(2). Venue over FHC for CRL's patent claim is also proper in this Court under 28 U.S.C. § 1400(b) because FHC has committed acts of patent infringement in this District.

## FACTUAL ALLEGATIONS

**A.      Background on CRL and Its Intellectual Property and Trade Secrets.**

16.     CRL designs, engineers, manufactures, and markets architectural hardware products and is the glass industry's leading source for supplies and equipment worldwide. Included among the tens of thousands of products CRL offers are commercial and residential architectural railings, frameless shower door hardware, transaction hardware, bath accessories, tools, sealants, fasteners, cleaners, and installation hardware. Indeed, in large and small glass shops around the world, CRL's comprehensive catalogs and website, www.crlaurence.com, are referenced daily for access to over 50,000 different products and value-added services.

17.     Through its efforts over the course of decades, CRL has invested significant time and millions of dollars in the co-development of, and in maintaining and protecting, proprietary state-of-the art software programs that it offers exclusively to its customers to build-out and price custom made products, including those that it

offers for sale ("Protected Computer Programs").

18.     CRL also has invested significant time and money developing, maintaining, and protecting information and data relating to its products which have significant independent economic value, potential and actual, as a result of not being generally known or readily ascertainable including by those in the industry. This information and data include highly confidential supplier information/vendor lists as well as information concerning the materials CRL purchases from them ("Supplier Information"), pricing and cost information, customer lists, and thousands of product designs and specifications ("Product Design Data") (together, "Confidential Information").

19.     CRL has also invested in protecting the novel and nonobvious features of its products by filing applications for both design and utility patents. One such patent is U.S. Patent No. 9,074,413 (the "'413 Patent"), which names a former CRL employee, Gary Sprague ("Sprague"), as its inventor. A copy of the '413 Patent is attached as Exhibit A.

CRL's Protected Computer Programs

20.     CRL offers to certain of its customers the Protected Computer Programs, which include the Storefronts Online, Showers Online, and Hand Rails Online software applications. CRL licenses the right to use these intuitive, user-friendly estimating and design programs to certain of its business customers to provide them the ability to design and quote, in a rapid and seamless manner, storefront products, enclosed shower products, and handrail products. The programs are designed to generate outputs that provide CRL's authorized business customers, among other things, the types of materials needed and precise measurements for them to build their desired projects with CRL products. Those outputs are based on CRL's business customers inputting numerous design variables—such as dimensions—regarding the types of construction products they hope to design and, in turn, sell to their own customers. After the design inputs are made, the Protected Computer Programs use a confidential and proprietary

process to generate the outputs. By using this asset, CRL's business customers can minimize errors on estimates and generate complete quote packages that provide various information in a matter of clicks. These assets of CRL are valuable because, among other things, they provide CRL's business customers the opportunity to bid more jobs for their downstream customers in less time to increase their competitiveness.

21.   CRL's Storefronts Online program—one of the three Protected Computer Programs, is a password-protected computer program that allows CRL's business customers to design and quote storefronts, all-glass entrances, curtain walls, and office partitions. Among other things, after certain inputs are provided, Storefronts Online generates an output that provides the required glass sizes, a parts list with pricing, three-dimensional enhanced drawings, and a complete set of fabrication and installation instructions. Benefits of the Storefronts Online program include, among other things, that it:

- Provides designs for all-glass entrances, storefronts, curtain walls, and office partitions;
- Allows bidding more jobs in less time;
- Provides an automated process that minimizes errors on estimates;
- Produces glass size and material fabrication details;
- Determines all materials required and optimizes material yield across multiple openings;
- Provides fabrication and installation details;
- Optimizes material fabrication for higher yields; and,
- Can be accessed on the job site using mobile devices.

22.   CRL's Showers Online program—another of the Protected Computer Programs—is a password-protected computer program that allows business customers to design a shower enclosure by entering a product list and the rough opening dimensions. The program then calculates the final glass sizes required and displays detailed information concerning the shower's design and construction, including hinge

and handle locations, miters, and more. Traditionally, the biggest road block for the heavy glass shower enclosure business has been the substantial time it takes to manually work through an enclosure design, compute the glass sizes, gaps, hardware selection, and associated template locations and, even when these variables are determined, there remains a question of accuracy, revisions and costly reworks. The Showers Online program minimizes these roadblocks. The key benefits of the Showers Online program include, among other things, that it:

- Generates glass sizes from field measurements;
- Accurately calculates correct glass sizes, and all hardware locations, cut-outs, and gaps;
- Allows sizes for shower enclosures to be completed in just a few minutes;
- Provides online access availability anytime and anywhere;
- Provides three-dimensional color images;
- Exports the project to Drawing Interchange Format (*i.e.*, DXF) files for use with computer numerical control (*i.e.*, CNC) fabrication needs;
- Is programmed to provide warnings of possible problems with proposed design; and
- Provides the ability to build a library of customers' most common showers, which can be accessed for future work.

23. CRL's Hand Rails Online program—the third of the Protected Computer Programs in issue, is also a password-protected computer program that allows CRL's business customers to design, estimate, and install glass railing and windscreen systems. This innovative program automatically generates material lists, glass sizes, and fabrication details for desired projects. Customers can easily create a quote and order the necessary materials. Benefits of the Hand Rails Online program include, among other things, that it:

- Produces a full color three-dimensional rendering of dimensioned plan view for field installation;

6

- Is capable of producing pick and pack or fabricated railing systems;
- Determines material quantities needed for each project; and
- Produces glass sizes needed for railing or windscreen job.

24.    CRL invested millions of dollars in the development of the Storefronts Online, Showers Online, and Hand Rails Online programs and in the continued technological updates and other maintenance aspects of the Protected Computer Programs. CRL offers the Protected Computer Programs in the United States. The Protected Computer Programs reside on CRL protected computers in the United States, as the term "protected computer" is defined by 18 U.S.C. § 1030(e), and constitute "computer program[s] or software" and "computer services" that reside on a "computer network" and part of a "computer system" of CRL as those terms are defined by California Penal Code § 502(b). CRL offers its Protected Computer Programs to, and those programs are in fact used by, CRL customers in interstate commerce.

25.    CRL does not make any of its Protected Computer Programs freely accessible, but restricts them to selected CRL customers. To access and use the Protected Computer Programs, a customer must request a subscription from CRL and, if a subscription is granted and goes beyond a trial period, pay a monthly fee. All customers who are accepted subscribers to a Protected Computer Program must agree to strict terms of a license and are not granted access to use the programs without affirmatively agreeing to the license. Among other things, the license agreements for the Protected Computer Programs provide that access to each Protected Computer Program "is restricted to duly licensed licensees of Licensor [CRL] by means of an assigned password….and that Licensee shall hold the Password(s) in strict confidence and shall not disseminate or disclose the Password(s) to any third party." Each user within a single licensee-subscriber of the Protected Computer Programs has his or her dedicated password and subscription fees are based on the number of users within a licensee-subscriber organization; passwords are not shareable within a subscriber organization.

26.    CRL provides the subscriptions to its Protected Computer Programs, if at

7

all, only to its customers, not to its competitors. This is because CRL invested in, and has continued to invest in, the technology of the Protected Computer Programs to set itself apart in the market and to offer value to its customers unmatched by its competitors.

27.     CRL's Protected Computer Programs are confidential and proprietary and not publicly accessible.

CRL's Patented Door Rail System

28.     CRL has also invested in protecting the novel and nonobvious features of its products, including by filing the '413 Patent (Exhibit A). The '413 Patent protects a door-rail product that uses a spring action clamping member to secure one or more panes of glass. The '413 Patent's patented door rail system secures glass panes for use as doors or wall partitions. One advantage of the '413 Patent's inventive spring action clamping member over prior art systems is to eliminate the use of glue or other adhesives to hold glass panes in place, allowing for easier repair and replacement in the event of damage.

29.     The application for the '413 Patent was filed in 2014, issued on July 7, 2015 and was, at all relevant times, assigned to CRL.

30.     Sprague was an employee of CRL at all material times during the '413 Patent's invention, filing, prosecution, and issuance as CRL's Vice President, first of Engineering and then of Design, with the responsibility of steering research and development and identifying new products for development for CRL.

CRL Supplier Information

31.     CRL also has valuable Confidential Information that provides CRL economic benefits based on the fact that it is confidential to CRL and provides competitive benefits with respect to CRL's competitors. With respect to its Supplier Information—a subset of CRL's Confidential Information—CRL spent decades finding the perfect vendor source for each of its products. Obtaining its collection of vendors to source its products involved substantial investment, including painstaking trial and error

of researching and working with multiple vendors at times on a product-by-product basis, years of testing and modifying products, years of evaluating customer feedback, and years of working to obtain and provide proper pricing. The result of CRL's decades of investment is that approximately 75% of its more than 50,000 products are obtained across approximately 800 individually selected vendors who are spread throughout the world.

32.   CRL's Supplier Information was difficult to accumulate and assemble, and it is extensive. A single CRL product can have multiple different suppliers providing different components or parts that need to be manufactured to specific dimensions and specifications, and using materials with specific properties, in order to be assembled into a final, saleable product. In many instances, one supplier will not know all of the dimensions, specifications, or material requirements for the product that they provide components for; rather, CRL provides each supplier only with the information that particular supplier needs in order to manufacture the specific component or part for which it is responsible. Even the limited information that CRL communicates to each of its suppliers, however, is treated as highly confidential and proprietary to CRL.

33.   CRL's confidential suppliers are located all over the world. Many have manufactured for CRL for years as contract suppliers and do not maintain a public-facing website, do not publicize contact information (such as names, email addresses, or telephone numbers), and are difficult to identify and locate for a U.S.-based company—assuming that they can be identified or located at all. Indeed, CRL does not publicize its confidential supplier relationships or indicate which suppliers are responsible for which components or parts that it uses in its business.

34.   CRL purposefully does not make Supplier Information public; rather, it sells a large portion of the products it obtains from its suppliers under the CRL brand and maintains its Supplier Information—which includes the identity of suppliers along with associated contact information, details regarding the products or components that they supply, and information regarding costs, pricing and purchasing histories—in

databases with access limited to those who have certain login credentials.

35.     CRL's Supplier Information provides a competitive advantage because it allows CRL to offer customers thousands of products that have individually been located from choice vendors who have demonstrated through rigorous testing and consumer response that they can deliver products that meet CRL's high standards at a fair price. CRL's Supplier Information (including the detailed information regarding the variety of products and components each provides) could not be recreated by a competitor without extensive investigation, verifications, and negotiations over price, shipping, supply, and other confidential terms of CRL's business relationship with each supplier. CRL's suppliers (including both confidential suppliers and suppliers who are generally known) understand the value of the relationship they have with CRL and the confidential nature of the information that CRL provides to them, and CRL's suppliers are expected to honor the confidentiality of that information. If a competitor were to obtain CRL's Supplier Information, or a portion of such information, it would be able to reap the benefits of CRL's decades of investment in compiling such confidential data without any effort at all and would thus be able to compete unfairly. CRL's Supplier Information comprises confidential and proprietary data and derives significant independent economic value, actual or potential, from not being generally known and not being readily ascertainable to the public or other persons who can obtain economic value from its disclosure or use.

36.     CRL maintains lists of vendors and suppliers which it works with to manufacture its products, including its door products. Information on CRL's vendors and suppliers, and the materials, components, and other items CRL purchases from them, is not available to the public. As such, CRL maintains its vendor and supplier lists as confidential and proprietary information.

CRL's Proprietary Designs

37.     While CRL obtains approximately 75% of the products it sells from third-party suppliers, it designs and manufactures the remaining approximately 25% of

products it offers its customers. These in-house designed products in large part are based on confidential and proprietary designs and engineering/manufacturing processes, engineering drawings, product specifications, bills of materials, and documents specifying manufacturing processes. They comprise another part of CRL's Confidential Information, and are the result of significant investment of research, design, testing, modifications, and finalizing a product for market.

38.     Moreover, as discussed above, this confidential design information is at times part of CRL's Supplier Information. It is vital to the conduct of CRL's business and provides CRL with competitive advantages in sourcing products that meet the needs of CRL and its customers and end users.

39.     One such product line, based on confidential and proprietary designs, includes "panic door handles," along with their component parts. Such door handles allow for easy and quick, keyless exit from a room with a simple push of a spring action handle that quickly disengages a lock and/or door-latch. While other companies also sell such handles and component parts, CRL's handles and associated parts—based on proprietary designs—are known for their durability, reliability, and straightforward installation. The engineering and designs for these door handles lend themselves to these qualities and are maintained as confidential.

40.     CRL's Proprietary Design information comprises confidential and proprietary data and derives significant independent economic value, actual or potential, from not being generally known and not being readily ascertainable to the public or other persons who can obtain economic value from its disclosure or use.

CRL's Other Confidential Information

41.     If a competitor misappropriated CRL's other Confidential Information— namely, its customer lists and pricing information—it would allow a competitor to immediately identify actual and potential customers and instantly learn the history and specific details of the customers' business relations with CRL, to unfairly bid against CRL for services, to unfairly move business away from CRL, to unfairly gain

knowledge of the procedures that result in CRL's delivery of excellent services and products, and to unfairly gain access to the proprietary technical data used to develop CRL's proprietary products.

CRL's Efforts To Maintain the Confidentiality of Its Assets

42.    CRL takes substantial measures to safeguard its non-public, commercially valuable Confidential Information. For example, through its Employee Handbook and other policies, CRL requires that its confidential, proprietary, and trade secret information be kept strictly confidential. CRL's Employee Handbook & Acknowledgment states, as follows, in the page requiring an employee to acknowledge receipt of the Manual:

> I am aware that during the course of my employment, confidential information will be made available to me, *i.e.*, customer lists, pricing policies and other related information. I understand that this information is critical to the success of C.R. Laurence Co., Inc. and must not be disseminated or used outside of C.R. Laurence Co., Inc.'s premises. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

(Receipt & Acknowledgment of Employee Manual).

In another portion of the Employee Manual, it states as follows:

> **Confidential Information.**
>
> Your employment with C.R. Laurence Co., Inc. assumes an obligation to maintain confidentiality, even after you leave our employ....
>
> Any violation of confidentiality seriously injures C.R. Laurence Co., Inc.'s reputation and effectiveness. Therefore, please do not discuss C.R. Laurence Co., Inc. business with anyone who does not work for us, and never discuss business transactions with anyone who does not have a direct association with the transaction. Even casual remarks can be misinterpreted and repeated, so develop the personal discipline necessary to

maintain confidentiality. If you hear, see, or become aware of anyone else breaking this trust, consider what they might do with information they get from you….

No one is permitted to remove or make copies of any C.R. Laurence Co., Inc.'s records, reports or documents without prior management approval.

Because of its seriousness, disclosure of confidential information could lead to dismissal.

(Employee Manual).

In another portion of the Employee Manual, it states as follows:

**Unacceptable Activities.**

We expect each person to act in a mature and responsible way at all times. To avoid possible confusion, and spell out the more obviously unacceptable activities, read the list below. Your avoidance of these activities will be to your benefit. If you have any questions concerning any work or safety rule, or any of the unacceptable activities listed, please see your manager for an explanation.

Occurrences of any of the following violations, because of their seriousness, may result in immediate dismissal without warning:

…

Engaging in an act of sabotage; willfully or with gross negligence causing the destruction or damage of company property, or the property of fellow employees, customers, suppliers, or visitors in any manner.

…

Violating the nondisclosure agreement; giving confidential or proprietary C.R. Laurence Co., Inc. information to competitors or other organizations or to unauthorized C.R. Laurence Co., Inc. employees; working for a competing business while a C.R.

13

Laurence Co., Inc. employee; breach of confidentiality of personnel information.

…

Software and other copyright violations.

(*Id.*).

**Policy on Acceptable Use C.R. Laurence Net.**

C.R. Laurence Net users should not use the C.R. Laurence Net to access online services for personal business or activities, or for purposes that are adverse to the interests of C.R. Laurence or its customers, including engaging in unauthorized communications or disclosing to third parties the confidential or proprietary information of C.R. Laurence or its customers.

(*Id.*).

43.     All CRL employees are required to abide by the Employment Manual policies and sign an acknowledgement to treat CRL's proprietary information confidentially.

44.     CRL employees are also reminded verbally of their obligations to maintain the confidentiality of CRL Confidential Information.

45.     In addition, Hanstad, Dorado, and Sutherland were specifically aware of the proprietary nature of the Protected Computer Programs, and also that they were only accessible pursuant to a strict license agreement and by way of specifically assigned passwords. They also were aware that the Protected Computer Programs were an asset that set CRL apart from its competitors and that CRL did not make those programs accessible to competitors. In fact, while Dorado was employed by CRL, he was responsible in part for selling and managing customer subscriptions to the Storefronts Online program and, therefore, was particularly aware of the aforementioned license restrictions.

**B.    The Formation of FHC**

46.    Starting in August 2018, a number of CRL's employees terminated their employment with CRL, including, but not limited to, Defendant Hanstad (former Vice President of Architectural Sales) and Sprague (former Vice President of Engineering and later of Design).

47.    On information and belief, in February 2019, just six months after the above-mentioned departures from CRL, Defendant Hanstad purchased the domain name www.FHC-USA.com to compete with CRL.

48.    The individuals who formed FHC were well aware and knew of the confidential nature of CRL's Supplier Information.

49.    Indeed, FHC has itself conceded that Supplier Information, like that developed and assembled by CRL, constitutes a trade secret in the industry. FHC has itself affirmed under oath that its alleged supplier information is purportedly an FHC trade secret in a related lawsuit pending in California State Court involving a former CRL employee, *C.R. Laurence Co., Inc. v. Garcia*, Los Angeles Superior Court Case No. 20STCV27475. On information and belief, the supplier information that FHC asserted was its trade secret included, at least in part, CRL's Supplier Information.

50.    Defendant Hanstad has previously testified under oath that lists of vendors and suppliers with which FHC works and knowledge of the "materials, components, and other items FHC purchases from them" are considered confidential and proprietary information. Hanstad further testified that disclosure of such information would cause FHC "significant harm" and that competitors who obtained such information "would be able to use that information to strategically redirect resources, save costs, and modify products" and that information related to vendor and supplier lists "would allow them to use that vendor and supplier information to improve or develop their own products." Hanstad testified that such a result would "compromise" FHC's "competitive and economic advantage on the market."

51.    By April 5, 2019—just eight months after the departures from CRL, FHC

was incorporated under the laws of the State of California. The initial corporate filings of FHC, made in April and May 2019, list Hanstad as the Chief Executive Officer and Chief Financial Officer of FHC.

52.     On or around April 26, 2019, Barry Sutherland—a Director of Technical Sales in the Commercial Hardware Group and then later a Technical Sales Senior—terminated his employment with CRL. On information and belief, by sometime in May 2019, he was working for FHC. Current records of FHC show that Sutherland is a member of FHC.

53.     Since forming in California, in or around September 2020, FHC converted out and became a Delaware limited liability company. FHC and CRL are direct competitors.

54.     Since the formation of FHC, a number of additional employees departed CRL and, on information and belief, began working at FHC. These employees included CRL's former: Director of Commercial Hardware, Warehouse Supervisor, Manager of Operations, Senior Vice President for Manufacturing, Senior Product Manager, and members of CRL's advertising staff. Of particular note, Defendant Jesus "Jesse" Dorado—CRL's former Senior Technical Sales agent—terminated his employment effective April 8, 2020.

55.     On information and belief, FHC obtained CRL's information and know-how by taking data, documents, and/or files containing Confidential Information such that FHC could rapidly establish a foothold in the market and compete against CRL. On information and belief, the confidential information that FHC took included not only the Supplier Information and Product Information, but also confidential financial information regarding the success and relative sales of CRL's products and product categories.

56.     FHC was formed specifically to compete with CRL by offering, in part, exact duplicates and replacements for products that CRL had designed, developed, and sourced over the course of decades. Defendant Hanstad, FHC's Chief Executive Officer

and member, spent nearly fifteen years with CRL. Defendant Sutherland, FHC's Senior Vice President, spent more than twenty years with CRL. Hanstad and, indeed, FHC's own motto, "you now have a choice," acknowledge that FHC was specifically formed to compete against CRL. But, on information and belief, FHC's rapid growth and customer adoption was not accomplished by starting from scratch. Instead, FHC needed to rely heavily on foundational information as to the design, specifications, and suppliers for CRL's products and its proprietary business processes and Confidential Information.

57.    FHC routinely references CRL product parts on its website to illustrate where customers can substitute a purchase of a CRL product with an FHC product that is its exact duplicate. By way of example only:

- FHC Square 90 Degree Glass Clamp CSU90CH states: "Compare To" SGC90CH, the product number for CRL's Square 90 Degree Glass-to-Class Clamp.

- FHC Glendale Series Wall Mount Hinge – Full Back Plate GLENF1 states: "Compare To" GEN037, the product number for CRL's Geneva 037 Series Wall Mount Full Back Plate Standard Hinge.

- FHC Cox Wexford Easiflow Heavy Duty 7 to 1 Caulking Gun states: "Compare To" GA1204, the product number for CRL's Metal Strap Frame Caulking Gun.

- FHC Classic U-Channel For 3/8" Glass – 95" Long SUCD38BA states: "Compare To" SDCD38BA, the product number for CRL's Fixed Panel Shower Door Deep U-Channel – 95".

- FHC 6" Center-to-Center Tubular No Washers Back to Back Pull PHRN6X6CH states: "Compare To" BMNW6X6CH, the product number for CRL's BM Series Back-to-Back Handle Without Metal Washers.

- FHC Clear Grommet for 3/4" Diameter Shower Pulls And Towel Bars 10/Pk CG034 states: "Compare To" HW059, the product number for CRL's 1/2" Outside Diameter Replacement Macaroni for 3/4" Standoffs.

- FHC Patriot Beveled Pivot Hinge L-Wall Mount 3/8" Glass PAT90CH states: "Compare To" PPH05RCH, the product number for CRL's Prima 05 Series Right Hand Offset Mount Hinge.
- FHC 120" Small Profile Base Shoe For 3/8" Or 1/2" Glass - W/Drilled Holes WBS10D states: "Compare To" W5B10D, the product number for CRL's 120" Small Profile Windscreen Base Shoe for 3/8" or 1/2" Glass - With Drilled Holes.
- FHC 1091 SDC Spacesaver® Electric Dead Bolt Locks with Mechanical Release 1091AL states: "Compare To" MLEDB1, the product number for CRL's Electric Solenoid Bolt Lock.
- FHC Sliding Door Handle Set Surface Mount - Black Aluminum C1001 states: "Compare To" C1001, the product number for CRL's Black Standard Profile Hook-Style Surface Mount Handle 4-15/16" Screw Holes.
- FHC 120" Long Aluminum Smoke Baffle - 1/2" and 9/16" Glass SB12C10 states: "Compare To" B5B10, the product number for CRL's Mill Aluminum Smoke Baffle Base Shoe for 1/2" Glass.
- FHC Casement Operator 8" Teardrop Type Left Hand – Aluminum H3501 states: "Compare To" 5008LHAL, the product number for CRL's Aluminum 8" Left Hand Teardrop Series Casement Window Operator.
- FHC Patch Lock With 5/8" Diameter Bolt Throw PF215PS states: "Compare To" AMR215PS CRL's Polished Stainless AMR215 Series Patch Lock.
- FHC Achieve Base Shoe 240" Length - Undrilled Mill Aluminum 11/16" Laminated Glass, A3M20 states: "Compare To" 9BL68, CRL's Mill Aluminum 9BL Series Standard Square Base Shoe - Undrilled 118-1/8" Length.

- FHC Connector Sleeves For 1-7/8" Diameter Roll Formed Cap Rail - Stainless Steel, RC20CSS states: "Compare To" GRRF20CSS, CRL's Stainless Steel Connector Sleeve for 1-7/8" Roll Form Cap Rails.
- FHC 36" Saddle Threshold 1/2" X 4" - Dark Bronze Anodized, TH4DU36 states: "Compart To" TH014D36, CRL's Dark Bronze 4" x 1/2" Saddle Aluminum Threshold - 36-1/2" Long.

There are numerous other such examples, including just a portion of hinges: FHC Product No. GLENF1 & CRL Product No. GEN037; FHC Product No. GLENA4 & CRL Product No. GEN337BN; FHC Product No. GLENF5 & CRL Product No. GEN537CH; FHC Product No. GLEN03 & CRL Product No. GEN044; FHC Product No. GLEN05 & CRL Product No. GEN5440RB; FHC Product No. GLENS2 & CRL Product No. GEN074; FHC Product No. GLENS5 & CRL Product No. GEN574CH; FHC Product No. GJRF5 & CRL Product No. JRG537CH; FHC Product No. PRES03 & CRL Product No. P1N044; FHC Product No. PRESS2 & CRL Product No. P1N074; FHC Product No. PRESA4 & CRL Product No. P1N337BN; FHC Product No. PRESF1 & CRL Product No. P1N037; FHC Product No. PRESF5 & CRL Product No. P1N537CH; FHC Product No. PRES03 & CRL Product No. P1N044; FHC Product No. VENF1 & CRL Product No. V1E037; FHC Product No. VENF5 & CRL Product No. V1E537CH; FHC Product No. VEN03 & CRL Product No. V1E044; FHC Product No. VENS2 & CRL Product No. V1E074; and FHC Product No. VENA4 & CRL Product No. V1E337BN.

58.    Through copying the specifications of CRL's products, expressly referencing the "compare to" model number on CRL's website, and its unauthorized use of CRL's Protected Computer Programs to design projects that incorporate such products for FHC's customers, FHC has regularly traded on CRL's name, goodwill, and Confidential Information and misappropriated the same in a scheme to sell FHC's products. As set forth in detail below, FHC and its employees illegally accessed CRL's Protected Computer Programs to design projects for FHC customers, then took the

information generated by the Protected Computer Programs (including the parts list), substituted FHC parts for CRL parts which contain a "compare to" number, and sold the project to FHC customers.

59.     Customers in CRL's business have always had a choice of supplier and, indeed, CRL faces stiff competition from numerous other companies in the industry, which is why it has made such substantial investments in its assets, including the Protected Computer Programs, the '413 Patent, the Supplier Information, its Proprietary Designs, and other Confidential Information. FHC is not competing fairly in the marketplace. Instead, as set forth below, among other things, FHC has unlawfully used passwords it does not have a right to use in order to illegally access and use CRL's Protected Computer Programs, violated CRL's '413 Patent by, at minimum, offering for sale and selling FHC's Herc-Door™ rail system, stolen CRL's Confidential Information comprising trade secrets, and engaged in numerous additional forms of unfair competition.

**C.     Defendants Engage In Illegal Conduct and Unlawful Competition.**

<u>Illegal Access to CRL's Protected Computer Programs</u>

60.     Sutherland was employed by CRL from approximately February 1999 until approximately April 2019, when he terminated his employment. While he was an employee of CRL, Sutherland was responsible for managing and working on the day to day activities of a group of estimators. The Protected Computer Programs were (and are) the primary tool used by estimators of sales of CRL's lead products. Sutherland worked closely with large account customers who used the Protected Computer Programs as the primary tool for preparing quotes and orders. Sutherland was intimately familiar with the Protected Computer Programs' licensing and subscription terms— including that the programs were password protected programs and that passwords should not be provided to CRL competitors among others.

61.     While he was an employee of CRL as a Senior Technical Sales agent, Defendant Dorado's responsibilities included interacting with CRL customers, including

with respect to the Storefronts Online program. Dorado was responsible in part for selling and managing subscriptions (and therefore knowing the terms of licensing the subscriptions) for CRL customers of the Storefronts Online program. In April 2020, Defendant Dorado terminated his employment. On information and belief, Dorado's employment with FHC began shortly after he terminated his employment with CRL.

62.     After the creation of FHC, unbeknownst to CRL, Defendants Steinberg and Glasswerks took a password licensed from CRL to Glasswerks for the Storefronts Online program and transferred that password to FHC employee Dorado. On information and belief, unbeknownst to CRL, Steinberg and/or Glasswerks also took passwords licensed from CRL to Glasswerks for the Showers Online program and Handrails Online program and transferred those passwords to other FHC employees.

63.     At least as of June 2020, unbeknownst to CRL, after numerous of CRL employees departed and began working for FHC, FHC and various of its employees made unauthorized access to the Protected Computer Programs using passwords that were subject to the license from CRL to Glasswerks, and, perhaps, other passwords.

64.     By way of example, in early November 2020, while employed by and acting on behalf of FHC, Dorado illegally accessed and used CRL's Storefronts Online program to design and sell a panic door handle product to a company known as Hartung Glass ("Hartung"). Hartung has been a customer of CRL. Dorado cultivated from the Storefronts Online program documentation generated by knowingly, and without authority, improperly using a login credential and password that CRL had licensed to Glasswerks, which has been and still is a customer of CRL.

65.     In connection with illegally accessing the Storefronts Online program and taking documentation generated by that program, Dorado and FHC then tried to conceal their illegal activity and the true source of the design by scrubbing CRL-branding and other CRL-related information from the documentation and inserting in its place FHC branding and other information to make it appear as if the documentation was a native FHC document. The documentation contains metadata showing that Dorado modified

the documentation on November 4, 2020 to at least add comments that were specific to Hartung's job requests. The documentation generated by the Storefronts Online system is attached hereto as Exhibit B. The modified documentation that Dorado used in connection with FHC's attempt to sell the product to Hartung, with the revealed metadata, is attached hereto as Exhibit C.

66.    FHC's and Dorado's illegal session left a trail to FHC's computers. On information and belief, the aforementioned session was done with a computer named "WS-NUC-TSL-CMCL." That computer, on numerous instances, was connected to a print server named "**PRT-SRVR.fhc.local**" thus reinforcing that FHC and Dorado logged into the Storefronts Online program from FHC using a password they knew they had no right to use and intentionally masked their unauthorized access to CRL's protected computers to hide from CRL the fact that they were using the Protected Computer Programs illegally.

67.    The naming convention of Dorado's computer—specifically, WS-NUC-TSL-CMCL—is similar to the naming convention of at least four other computers that were used to illegally access CRL's Protected Software Programs, including the following: WS-NUC-TSL-21; WS-NUC-CRP-95; WS-TSL-NUC-205; and WS-TSL-NUC-207. These computers with the "WS" naming convention gained unauthorized access by using at least three different password/log-in credentials from Glasswerks, which was CRL's paying customer for those programs. On information and belief, the naming convention for the "WS" computers differs from the naming convention of the computers used by Glasswerks—which was and is CRL's paying customer for those programs.

68.    In addition, on information and belief, the computers identified by the "WS" naming convention logged into the Protected Computer Programs from the same internet protocol address subnet, reflecting that the sessions from the "WS" computers originated from a single sub-network. By contrast, on information and belief, all of the computers using a naming convention of the computers used by Glasswerks—CRL's

paying customer for the Protected Computer Programs—logged into the Protected Computer Programs from a different private internet protocol address subnet, thus reflecting that Dorado and FHC were logging in from a different sub-network for their illegal activity than the sub-network used by Glasswerks.

69. The illegal activity described above is not an isolated incident. Since at least November 2020, there have been at least dozens of instances of unauthorized access to CRL's Protected Computer Programs made by computers identified with the "WS" naming convention from the same sub-network and that were connected to the fhc.local print servers. There have been at least 31 separate sessions that involved logging into the Protected Computer Programs from computers with the "WS" naming convention that were connected to the fhc.local print server, like the computer used to create Dorado's and FHC's project on November 4, 2020, thus reflecting that Dorado as well as other users from FHC have illegally accessed CRL's Protected Computer Programs.

70. Had CRL known that Glasswerks and Steinberg would illegally traffic to FHC and its employees CRL passwords licensed to Glasswerks for the Protected Computer Programs, CRL would not have allowed Glasswerks or Steinberg access to those programs.

71. Since CRL discovered that Dorado made unauthorized access to the Protected Computer Programs, CRL learned that other FHC employees have made unauthorized access to the Protected Computer Programs. To date, CRL has discovered that Dorado made unauthorized access to the Storefronts Online Program on at least one-hundred sixteen (116) occasions, that Sutherland made unauthorized access to the Storefronts Online Program on at least nineteen (19) occasions, and that other FHC employees made unauthorized access to the Showers Online Program and the Handrails Online Program on at least thirty-six (36) occasions.  As admitted in the document provided by FHC in response to this Court's Order granting CRL's motion for a preliminary injunction [Dkt. No. 46], Sutherland signed on to and used CRL's Protected

Computer Programs—specifically Storefronts Online, and thus made unauthorized access, on at least the following occasions:

- December 8, 2020
- December 18, 2020
- December 18, 2020
- December 18, 2020
- December 21, 2020
- December 22, 2020
- December 28, 2020
- December 30, 2020
- January 11, 2021
- January 12, 2021
- January 12, 2021
- January 14, 2021
- January 15, 2021
- January 15, 2021
- January 16, 2021
- January 18, 2021
- January 19, 2021
- January 20, 2021
- February 5, 2021

72.     FHC has admitted that it transacted business with more than a dozen customers in connection with its unauthorized access to CRL's Protected Computer Programs.

73.     FHC used CRL's Protected Computer Programs to design enclosures and projects and, due to the similarity of their components, materials and product, misused CRL's own Protected Computer Programs to sell FHC products to be used in the designs, including, but not limited to: FHC door rails, side rails, and headers, PRL panic

24

handles, FHC Carmel series sliding doors, FHC door rails, headers and hardware, shower hardware, and custom railing post kits.

FHC's Infringement of CRL's Patent

74.     In the summer of 2018, in connection with his resigning his employment, Sprague advised CRL's management that he intended to change industries. He ended his employment with CRL on August 10, 2018.

75.     On information and belief, however, Sprague had no intention of changing industries. In fact, based on public press releases, in or around March 10, 2020, FHC appointed Sprague as its Vice President of Design and Development with the responsibility of "steering R&D and new product development for the company"— effectively, the identical position that Sprague held at CRL (https://fhc-usa.com/press-release-03-10-2020, last visited February 11, 2021).

76.     On information and belief, around or shortly after Sprague's arrival at FHC, FHC started offering a competing door rail product, the "Herc-Door™ Rail," that it marketed as embodying a new and "Patent Pending UNITIZING GASKET" to secure one or more glass panes in a door rail by exerting pressure on the glass to securely hold the glass in place without breaking it, thereby eliminating the need to use glue or another adhesive. As set forth in more detail below, the Herc-Door™ Rail infringes at least claim 1 of the '413 Patent. Further, and on information and belief, Sprague was involved in the design of the Herc-Door™ Rail.

//

FHC's Additional Wrongful Conduct

77.     CRL is informed and believes that Defendants FHC and Hanstad misappropriated CRL's Confidential Information, including, *inter alia*, highly confidential Supplier Information/vendor lists and customer data. CRL's Confidential Information constitutes trade secrets under Federal and California law.

78.     Among the Supplier Information that FHC has used is specific information regarding the identity of the supplier and certain types of dimensions, material

requirements, and specifications for parts and components that CRL has developed and maintained as its proprietary trade secrets. These details, as well as other aspects of CRL's Supplier Information, are so numerous and specific that they could not have been maintained in the memory of any one individual or even in the collective memory of multiple individuals. FHC has known that such Supplier Information is confidential and a CRL trade secret. On information and belief, FHC has misappropriated the identity of CRL's confidential suppliers and misappropriated CRL's parts dimensions, material requirements, and specifications by improperly obtaining such information including while having knowledge or reason to know that such information was confidential and a trade secret.

79. There is also direct evidence that FHC has misappropriated CRL's Supplier Information through unlawful means.

80. In January 2020, Armando Rodriguez, who at that time was CRL's Senior Vice President for Manufacturing, provided notice that he was terminating his employment with CRL. Mr. Rodriguez's last official day of employment at CRL was March 2, 2020. Immediately after his employment with CRL ended—as of March 5, 2020, Mr. Rodriguez was employed by FHC and identified himself as its Vice President of Manufacturing.

81. On April 21 and/or 22, 2020—approximately six weeks after Mr. Rodriguez departed CRL to become FHC's Vice President of Manufacturing, certain CRL employees witnessed suspicious conduct of CRL's then employee Angel Garcia. Mr. Garcia and Mr. Rodriguez are family members and/or close personal friends. Mr. Garcia had printed out a stack of engineering drawings containing proprietary information of a CRL product, including "panic door handles," even though his job did not require him to possess these engineering drawings. Another witness saw Mr. Garcia taking pictures of proprietary parts with his cell phone camera. On the same day, a CRL employee overheard Mr. Garcia on the telephone stating "Hay varias huey" (there's a lot, dude) and "no esta Jonathan, esta en vacaciones" (Johnathan is not here, he is on

vacation). "Johnathan" is the CRL supervisor for the "panic door handle" parts. Mr. Garcia has admitted under oath that the person to whom he was speaking on the telephone about there being "a lot" and about Jonathan being on vacation was Armando Rodriguez—the Vice President of Manufacturing at FHC.

82.     Immediately after being caught misappropriating CRL's trade secrets, Mr. Garcia telephoned Armando Rodriguez at FHC.

83.     CRL has uncovered other evidence of FHC's theft of its confidential supplier information. In July 2021, CRL received a shipment from one of its confidential suppliers, Supplier 1. Supplier 1 is a company in Asia that manufactures CRL designed products for sale to CRL's customers. Included in a bulk shipment from Supplier 1 to CRL were two boxes bearing FHC's branding. The boxes included a brushed nickel HD Beveled Wall Mount Clamp, part number CBU4BN. FHC's website specifically directs its customers to "compare" this part to a product CRL sells: CRL's Brushed Nickel Beveled Hole-in-Glass Style Wall Mount Heavy Duty Glass Clamp, CRL part number BCU4BN. On information and belief, Supplier 1's contact information is not publicly accessible and, as such, FHC could only have contacted Supplier 1 through the misappropriation of CRL's confidential trade secret information.

84.     Even if FHC was able to locate and identify one or more confidential CRL supplier(s) without using CRL's confidential information or trade secret Supplier Information, that would still not be enough for FHC to conduct its business and produce products with the exact same dimensions and specifications as CRL (as FHC has done). Knowledge of CRL's suppliers—and, as noted, there are more than 800 of them—is by itself not enough to produce products with the same dimensions and specifications as CRL's products.

85.     Rather, on information and belief, FHC used the specific information that CRL has provided to its suppliers for each and every component and part that CRL sources from them and that FHC also supplies. Such information does not constitute knowledge or skill of an employee, but rather comprises express dimensions and

specifications of products. On information and belief, FHC misappropriated CRL's parts, dimensions, and specifications by improperly obtaining such information including while having knowledge or reason to know that such information was confidential and a trade secret.

86.    There is also substantial circumstantial evidence that FHC has misappropriated CRL's Supplier Information. For example, CRL sells a 180° hinge which joins two large glass panes without a frame. That hinge, which is named the "Vienna Hinge," measures 2-1/4" horizontally from center and 3-15/16'" high, and has a part number of V1E180CH. CRL keeps confidential the supplier for that hinge. FHC—in direct competition with CRL—purports to have an identical sized hinge with a similar name, "Venice Hinge," and part number, VEN180.



CRL also sells the Vienna Hinge in a 135° and 90° formats, and FHC sells identical "Venice Hinges" in those formats, too.

87.    CRL also sells a Tubular Back-to-Back Pull Handle for shower doors, which is essentially a pair of door handles that mount on the inside and outside of shower doors. That pull handle product measures 6" in height, comprises ¾" diameter tubular construction, and is part number BM6x6CH. CRL keeps confidential the supplier of that pull handle. FHC sells an identical Center-to-Center Tubular Pull measuring 6" in height, comprising ¾" diameter tubular construction, and is part number PHR6X6BN. The products look identical:

 

88.     The foregoing are merely examples of the substantial circumstantial evidence that FHC misappropriated CRL's Supplier Information in starting and growing its business, including confidential product information included in the Supplier Information. When coupled with the direct evidence of Mr. Garcia misappropriating confidential product information for FHC's benefit, the single most plausible inference that FHC and its employees and agents misappropriated CRL's Supplier Information for their benefit and to CRL's detriment.

89.     FHC is currently using CRL's unlawfully obtained Confidential Information to compete against CRL in the market place. For example, despite only opening for business in November 2019, FHC offers for sale numerous identical or nearly identical products that CRL has spent decades compiling for its customers. Given the time, effort, and sophistication required to determine product specifications and attributes, identify suppliers and vendors (many of them located overseas), and negotiate with the more than 800 vendors/suppliers of these individual products, there is no realistic possibility that FHC (including its employees) could have drawn only from their knowledge or skills from working for CRL to compile, in the approximately one year since the departures from CRL, the FHC roster of suppliers and products.

90.     Rather, if former CRL employees had merely used their knowledge and skills from their prior employment with CRL, it would have taken years, if not decades, to identify and create their supplier list and source their products. Instead, on information and belief, FHC unlawfully obtained and used CRL confidential and

proprietary vendor/Supplier Information and unlawfully used that information to compete against CRL by offering for sale the same or similar products – products which CRL spent decades finding.

91. CRL is further informed and believes that discovery will uncover additional evidence of FHC's misappropriations, including that FHC has copied CRL's Supplier Information wholesale in order to get a head start in its business operations. Indeed, taking all of FHC's wrongful activities into account, including its unauthorized and improper access to CRL's Protected Computer Programs as well as the above-mentioned direct evidence of actual and attempted misappropriations of CRL's Supplier Information by FHC, the single most reasonable inference is that FHC has misappropriated CRL's trade secrets.

92. FHC's wholesale theft of intellectual property further extends to the manner in which products are presented and described to consumers. In instances on its website, FHC has copied verbatim CRL's product descriptions. For example, CRL sells a "CRL Metal Strap Frame Caulking Gun," and provides a description of that product on its website at http://www.crlaurence.com/crlapps/showline/offerpage.aspx?ProductID=52911&GroupID=57971&History=39324:112:57915:57916:57975:57916&ModelID=57971&pom=0. FHC presents an identical caulking gun for sale on its website located at https://www.fhc-usa.com/catalog/product/view/ id/3724/s/cc41r/ (last visited February 10, 2021) and literally copied CRL's product description, going so far as to also describe it as a "**CRL** Metal Strap Frame." (Emphases added.) The competing product entries are depicted as follows:

**CRL Description**                    **FHC Description**

The strap frame design for caulking guns is becoming increasingly appealing, as witnessed in the fast-growing popularity of this quality gun. The **CRL Metal Strap Frame Gun** has a friction hex drive rod plunger, heavy diecast zinc alloy frame and trigger, and a thumb pressure release that lets you load and dispense quickly and easily, and releases pressure on the plunger to prevent sealant run-on. Includes built-in ladder hook, and handy seal piercer located in the handle of the sturdy steel skeleton type frame.

 

**DETAILS**

**Overview**

The strap frame design for caulking guns is becoming increasingly appealing, as witnessed in the fast-growing popularity of this quality gun. The CRL Metal Strap Frame Gun has a friction hex drive rod plunger, heavy diecast zinc alloy frame and trigger, and a thumb pressure release that lets you load and dispense quickly and easily, and releases pressure on the plunger to prevent sealant run-on. Includes built-in ladder hook, and handy seal piercer located in the handle of the sturdy steel skeleton type frame.

⚠ **WARNING:** This Product May Contain Chemicals Known to the State of California to Cause Cancer or Reproductive Harm. To Learn More Visit P65Warnings.ca.gov

**MORE INFORMATION**

93.     The Vienna Hinge, the Back-to-Back Pull Handle, and the Metal Strap Caulking Gun, and the "compare to" examples set forth above, are just a fraction of the examples of the numerous instances where FHC offers for sale and sells the same exact product based on misappropriating CRL's Confidential Information and other intellectual property, and based on unfair competition. *See supra* Paragraph 57. The entire FHC website is populated with products that either are identical or near-identical to the products CRL has spent decades sourcing and fine-tuning.

## **FIRST CLAIM FOR RELIEF**

**Violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et seq*.)**

**(Against Defendants FHC, Dorado, Sutherland, Glasswerks, and Steinberg)**

94.     CRL repeats the allegations set forth above in Paragraphs 1 through 93 as though fully set forth herein in this paragraph.

95.     CRL's Protected Computer Programs reside on CRL's protected computers, which are used in and affect at least interstate commerce and otherwise satisfy the requirements of being a "protected computer" under 18 U.S.C. § 1030(e).

96.     FHC, Dorado, and Sutherland violated 18 U.S.C. § 1030(a)(2)(C) because they intentionally accessed CRL's computer(s) without authorization or exceeded authorized access and obtained information from CRL's protected computer(s). Among other things, by virtue of previous employment with CRL, Dorado, Sutherland, and FHC officers—and therefore FHC—knew CRL's Protected Computer Programs were

password protected and were strictly reserved for use to only licensees who properly subscribed to the program and by the employee of the licensee assigned a specific, unique password. Dorado, Sutherland, and FHC also knew that CRL's Protected Computer Programs were subject to license agreements restricting access, including prohibiting the sharing of passwords, and further knew CRL strictly prohibited access to competitors. FHC, Dorado, and Sutherland nevertheless intentionally accessed the Protected Computer Programs without authorization by improperly and surreptitiously using another's password and intentionally accessing CRL's protected computer(s) so FHC could reap the benefits of the Programs to obtain information and sell designed products to compete specifically against CRL. Their access to the Protected Computer Programs was for the purpose of furthering the interests of FHC, a competitor to CRL, including in knowing violation of CRL's policies and procedures governing access and the law. The November 2020 instance alleged above is just one instance of a violation of 18 U.S.C. § 1030(a)(2)(C); additional instances are admitted in the document provided by FHC in response to this Court's Order granting CRL's motion for a preliminary injunction [Dkt. No. 46].

97.     FHC, Dorado, and Sutherland violated 18 U.S.C. § 1030(a)(4) because they knowingly and with the intent to defraud, accessed CRL's protected computers without authorization, or in excess of authorized access, and by means of such conduct furthered their intended fraud and obtained value in excess of $5,000. Among other things, by virtue of previous employment with CRL, Dorado, Sutherland, and FHC officers—and therefore FHC—knew CRL's Protected Computer Programs were password protected and were strictly reserved for use to only licensees who properly subscribed to the program and by the employee of the licensee assigned a specific, unique password. Dorado, Sutherland, and FHC also knew that CRL's Protected Computer Programs were subject to license agreements restricting access, including prohibiting the sharing of passwords. Dorado, Sutherland, and FHC further knew CRL strictly prohibited access to competitors. Dorado, Sutherland, and FHC nevertheless intentionally accessed the

Protected Computer Programs surreptitiously by masking their improper use of another's password and intentionally accessing CRL's protected computers so FHC could reap its benefits to obtain information and sell CRL designed products to compete specifically against CRL. Their access to such programs was for the purposes of furthering the interests of FHC, a competitor to CRL, in knowing violation of CRL's policies and procedures governing such access and was done with an intent to defraud CRL by using its Protected Computer Programs illegally and at CRL's expense. The November 2020 instance alleged above is just one instance of a violation of 18 U.S.C. § 1030(a)(4); additional instances are admitted in the document provided by FHC in response to this Court's Order granting CRL's motion for a preliminary injunction [Dkt. No. 46].

98.     FHC, Dorado, and Sutherland illegally accessed the Protected Computer Programs, without authorization, on at least 171 occasions to design jobs in a similar manner and to compete specifically with CRL.

99.     Glasswerks and Steinberg violated 18 U.S.C. § 1030(a)(6) because they knowingly and with intent to defraud trafficked in at least three passwords to the Protected Computer Programs—at least one for each of the Storefronts Online Program, Showers Online Program, and Handrails Online Program—through which a computer was accessed without authorization and such trafficking has affected interstate commerce. Steinberg and Glasswerks transferred passwords for the Protected Computer Programs from Glasswerks to FHC with the intent to defraud CRL. When Glasswerks and Steinberg transferred the passwords, they did so with the intent to allow FHC to use CRL's Protected Computer Programs but to conceal such use from CRL and to have FHC compete against CRL.

100.    FHC's, Dorado's, Sutherland's, Glasswerks', and Steinberg's conduct has caused a loss to CRL during a one-year period aggregating at least $5,000.00 in value, including but not limited to the expenses CRL has been forced to incur in order to respond to FHC's, Sutherland's, Dorado's, Glasswerks', and Steinberg's unauthorized

access and to take corrective action and protect the integrity of its protected computers.

101.   FHC's, Dorado's, Sutherland's, Glasswerks', and Steinberg's conduct, including unlawful access to CRL's protected computers (including its servers) has caused CRL irreparable injury. Unless restrained and enjoined, those Defendants will continue to engage in such acts. CRL's remedy at law is therefore inadequate to compensate it for the past and threatened injuries and thus CRL is entitled to injunctive and equitable relief as provided for by 18 U.S.C. § 1030(g). CRL is entitled to equitable relief at least in the form of (1) an injunction to restrain all wrongful conduct alleged herein, and (2) an order of disgorgement and restitution of all sums received by such Defendants as a result of their wrongful conduct and unjust enrichment. CRL also is entitled to and prays for all other remedies available under 18 U.S.C. § 1030(g), including but not limited to compensatory damages, including those damages suffered as a result of Defendants' theft and violations of the CFAA which, among other things, have caused CRL to (1) incur costs to respond to the offense and (2) suffer lost revenues that would have been made in part if not in whole by CRL had not Defendants made their unauthorized access to the Protected Computer Programs.

## SECOND CLAIM FOR RELIEF

### Violation of California Computer Data Access and Fraud Act

### (Cal. Penal Code § 502)

### (Against Defendants FHC, Dorado, Sutherland, Steinberg, and Glasswerks)

102.   CRL repeats the allegations set forth above in Paragraphs 1 through 101 as though fully set forth herein in this paragraph.

103.   FHC, Dorado, and Sutherland violated Cal. Penal Code § 502(c) by intentionally accessing CRL's computer systems without authorization and thereby causing damages to CRL by using CRL's proprietary and confidential computer programs/software—including CRL's Storefronts Online program, Showers Online program, and Hand Rails Online program.

104.   FHC, Dorado, and Sutherland violated Cal. Penal Code § 502(c)(1) by

knowingly accessing and without permission using CRL's computer(s), computer system, or computer network in order to (A) devise or execute a scheme or artifice to defraud and deceive, and (B) wrongfully obtain property and data. Among other things, by virtue of previous employment with CRL, Dorado, Sutherland, and FHC officers— and therefore FHC—knew CRL's Protected Computer Programs were password protected and were strictly reserved for use to only licensees who properly subscribed to the program; they knew CRL prohibited access to competitors. Those Defendants nevertheless intentionally accessed the Protected Computer Programs surreptitiously by masking their improper use of another's password and intentionally accessing those programs so FHC could reap its benefits to obtain information and sell designed products to compete specifically against CRL. For example, in the November 4 instance alleged above, FHC and Dorado obtained data relating to a panic door handle product by improperly accessing the Protected Computer Programs and then took further steps in their scheme to defraud by facilitating a sale that would compete specifically against CRL, including by removing the CRL brand and other CRL-related information. The November 4, 2020 instance is just one instance of a violation of Cal. Penal Code § 502(c)(1); additional instances are admitted in the document provided by, FHC in response to this Court's Order granting CRL's motion for a preliminary injunction [Dkt. No. 46], One or more FHC computers have illegally accessed the Protected Computer Programs, knowingly and without permission, on at least 171 occasions to design jobs in a similar manner and to compete specifically with CRL and violated Cal. Penal Code § 502(c)(1) in those instances as well.

105.    FHC, Dorado, and Sutherland violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, and making use of data from CRL's computer systems or computer network. Among other things, by virtue of previous employment with CRL, Dorado, Sutherland, and FHC officers—and therefore FHC—knew CRL's Protected Computer Programs were password protected and were strictly reserved for use to only licensees who properly subscribed to the program; they

knew CRL prohibited access to competitors. Those Defendants nevertheless intentionally accessed the Protected Computer Programs surreptitiously by masking their improper use of another's password and intentionally accessing the programs so FHC could reap its benefits to obtain information and sell designed products to compete specifically against CRL. For example, in the November 4 instance alleged above, FHC and Dorado obtained data relating to a panic door handle product by improperly accessing the Protected Computer Programs, knowingly and without permission, and then took further steps in their scheme to take, copy, and make use of data from the Storefronts Online program, including by removing the CRL brand and other CRL-related information. FHC and Dorado then completed that scheme by taking steps to facilitate a sale that would compete specifically against CRL. The November 4, 2020 instance is just one instance of a violation of Cal. Penal Code § 502(c)(2); additional instances, including violations by Sutherland and other FHC employees, are documented in the document provided by FHC in response to this Court's Order granting CRL's motion for a preliminary injunction [Dkt. No. 46], FHC, Dorado, and Sutherland illegally accessed the Protected Computer Programs, knowingly and without permission, on at least 171 occasions to design jobs in a similar manner and to compete specifically with CRL and violated Cal. Penal Code § 502(c)(2) in those instances as well.

106.   FHC, Dorado, and Sutherland violated Cal. Penal Code § 502(c)(3) by knowingly and without permission using or causing to be used CRL's computer services. Those Defendants accessed the Protected Computer Programs—computer services—without authorization, but while knowing that they needed authorization to use that program. The November 4, 2020 instance is just one instance of a violation of Cal. Penal Code § 502(c)(3); additional instances, including violations by Sutherland and other FHC employees, are documented in the document provided by FHC in response to this Court's Order granting CRL's motion for a preliminary injunction [Dkt. No. 46], FHC, Dorado, and Sutherland illegally accessed the Protected Computer

Programs, knowingly and without permission, on at least 171 occasions to design jobs in a similar manner—i.e., using the Protected Computer Programs, which are computer services—and to compete specifically with CRL and violated Cal. Penal Code § 502(c)(3) in those instances as well.

107.    Steinberg and Glasswerks violated Cal. Penal Code § 502(c)(6) by knowingly and without permission providing or assisting in providing a means of accessing a computer, computer system, or computer network in violation of subsection (c) of Cal. Penal Code § 502. Steinberg and Glasswerks provided the technological tools and means for FHC as well as Dorado, Sutherland, and other FHC employees to access the Protected Computer Programs—which reside on CRL's computers and/or requires access to CRL's computer systems or computer network—without permission, but while knowing that they needed permission to use those programs. Glasswerks and Steinberg provided the means of accessing the Protected Computer Programs without permission, but while knowing that they needed permission to use those programs.

108.    On information and belief, Glasswerks and Steinberg illegally provided or assisted, knowingly and without permission, the means of accessing the Protected Computer Programs on at least 171 occasions to design jobs for other customers in a similar manner and to compete specifically with CRL and violated Cal. Penal Code § 502(c)(6) in those instances as well.

109.    FHC, Dorado, and Sutherland violated Cal. Penal Code § 502(c)(7) by knowingly and without permission accessing or causing to be accessed CRL's computer, computer system, or computer network. FHC, Dorado, and Sutherland accessed the Storefronts Online program—which resides on CRL's computers and/or requires access to CRL's computer systems or computer network—without permission, but while knowing that they needed permission to use that program. The November 4, 2020 instance is just one instance of a violation of Cal. Penal Code § 502(c)(7); additional instances, including violations by Sutherland and other FHC employees, are documented in the document provided by FHC in response to this Court's Order

granting CRL's motion for a preliminary injunction [Dkt. No. 46], FHC, Dorado, and Sutherland, illegally accessed, knowingly and without permission, the Protected Computer Programs on at least 171 occasions to design jobs for other customers in a similar manner and to compete specifically with CRL and violated Cal. Penal Code § 502(c)(7) in those instances as well.

110.   FHC's, Dorado's, Sutherland's, Glasswerks', and Steinberg's conduct, including but not limited to their knowing unauthorized and unlawful access to and/or facilitation of access to, CRL's protected computers (including its servers), computer system, or computer network, and use of computer services to defraud, has caused CRL irreparable injury. Unless restrained and enjoined, those defendants will continue to engage in such acts. CRL's remedy at law is therefore inadequate to compensate it for the past and threatened injuries and thus CRL is entitled to injunctive relief as provided for by Cal. Penal Code § 502(e). CRL is entitled to equitable relief at least in the form of (1) an injunction to restrain all wrongful conduct alleged herein, and (2) an order of disgorgement and restitution of all sums received by those defendants as a result of their wrongful conduct and unjust enrichment. CRL also is entitled to and prays for all other remedies available under Cal. Penal Code § 502(e), including those damages suffered as a result of Defendants' illegal conduct and violations of Cal. Penal Code § 502 which have caused CRL to (1) incur costs to respond and corrective measure costs and (2) suffer lost revenues that would have been made in part if not in whole by CRL had not Defendants made their unauthorized access to the Protected Computer Programs.

111.   FHC's, Dorado's, Sutherland's, Glasswerks', and Steinberg's violations of Cal. Penal Code § 502, including violations of (c)(1), (c)(2), (c)(3), (c)(6), and (c)(7), were done willfully and with oppression, fraud, and malice as defined Cal. Civil Code § 3294(c). Among other things, by virtue of their previous employment with CRL, Dorado, Sutherland, and FHC officers—and therefore FHC—knew the Protected Computer Programs were password protected, were strictly reserved for use to only licensees who properly subscribed to the program, and were not services that were

provided to CRL's competitors. Notwithstanding this knowledge, those Defendants intentionally masked their conduct by using a password of another and intentionally and fraudulently used CRL's confidential and proprietary software to facilitate the creation of products that were then sold in competition with CRL.

112.   Glasswerks, and thus Steinberg, had knowledge of the restrictions on the Protected Computer Programs. Aside from the licenses between CRL and Glasswerks regarding the Protected Computer Programs, by virtue of the fact that passwords were required to access the programs, Steinberg was aware that they should not be shared—especially to competitors of CRL. FHC's, Dorado's, and Sutherland's, oppression, fraud, and malice is reinforced by the actions they took to remove the CRL brand and other CRL-related information from documentation generated by the Protected Computer Programs. Such conduct justifies an award of punitive and exemplary damages pursuant to Cal. Penal Code § 502(e)(4) and Cal. Civ. Code § 3294. CRL is also entitled to an award of its reasonable attorneys' fees and costs pursuant to Cal. Penal Code § 502(e)(2).

## **THIRD CLAIM FOR RELIEF**

### **Patent Infringement (35 U.S.C. 101 *et seq.*)**

### **(Against Defendant FHC)**

113.   CRL repeats the allegations set forth above in Paragraphs 1 through 112 as though fully set forth herein in this paragraph.

114.   CRL is the owner of the '413 Patent. The '413 Patent is directed to a rail assembly for releasably securing a panel of glass, a set of stiles that are releasably securable about the edges of a panel of glass, and a combined rail and style system for framing a door panel.

115.   The application that issued as the '413 Patent was filed on July 10, 2014, and the patent issued on July 7, 2015.

116.   The application names Sprague as its sole inventor. Sprague duly and lawfully assigned the '413 Patent to CRL.

117.   The '413 Patent is valid and enforceable.

118.   CRL markets, offers for sale, and sells a variety of door rail products for releasably securing a panel of glass in a variety of settings. Among its door rail products are the CRL Low Profile door rail system and the CRL ENTICE® door rail system. CRL's Low Profile door rail system is depicted below at left and the ENTICE® door rail system is depicted below at right.

 

119.   As CRL's products are innovative and industry leading, CRL has sought patent protection over them. For example, CRL's U.S. Patent Nos. 6,434,905 and 6,912,818, as well as the '413 Patent, all relate to CRL's investments in protecting its various door rail systems.

120.   The '413 Patent is in full force and effect and will continue to be for many years. Sprague is a named inventor on CRL's U.S. Patent Nos. 6,434,905 and 6,912,818, as well as the '413 Patent.

121.   CRL has complied with 35 U.S.C. § 287 and FHC has had actual notice that it infringes the '413 Patent. Among other things, FHC was on notice that the Herc-Door™ door rail system infringed the '413 Patent because FHC's principals and employees had knowledge of CRL's patented designs, including the '413 Patent's design, and, on information and belief, used that knowledge to design the Herc-Door™ door rail system. Additionally, on information and belief, Sprague himself was involved

in the design of the Herc-Door™ door rail system and knew that it infringed the '413 Patent.

122.   Additionally or alternatively, FHC has had actual knowledge that it infringed the '413 Patent as of the filing date of this Complaint under 35 U.S.C. § 287.

123.   The '413 Patent uses a spring action clamping member that has an open position in which a glass panel can be freely removed and a closed position wherein the panel to be secured is clamped within the rail body. A screw engaged in the rail body has an end in contact with the spring action clamping member. Turning the screw causes the spring action clamping member to move upward, which causes the upper arms of the spring action clamping member to slide upwardly against mutually opposed inclined surfaces within the rail body. This upward motion causes the upper ends of the arms to translate inwardly, applying clamping pressure to each side of the panel to be secured. Specifically, claim 1 of the '413 Patent recites as follows:

1. A rail assembly for releasably securing a panel, the rail assembly comprising:
a rail body having mutually opposed inclined surfaces, angled inwardly towards the panel to be secured;
a spring action clamping member, having mutually opposed walls, the walls having mutually opposed upper ends, the upper ends configured to slide against the inwardly inclined surfaces of the rail body;
wherein the spring action clamping member is movable between an open position wherein the panel to be secured may be freely removed from the rail body and a closed position wherein the panel to be secured is clamped within the rail body; a screw engaged with the rail body having an end in contact with the spring action clamping member; and
wherein actuation of the screw from the open position causes the clamping member to move upwardly causing the upper ends of the mutually opposed walls of the clamping member to slide upwardly against the mutually opposed inclined

1  surfaces of the rail body, said upward motion causing the upper ends to translate

2  inwardly, applying clamping pressure to each side of the panel to be secured.

3      124.   On information and belief, within the last year, FHC introduced its Herc-

4  Door™ door rail system to directly compete against CRL's door rail systems. Indeed,

5  FHC made the Herc-Door™ door rail system look almost exactly like CRL's Low

6  Profile door rail system, copying CRL's design down to the placement of a screw and

7  putting FHC's lettering in the same location and font as CRL's lettering, as shown

8  below (CRL at left, FHC on the right):

 

22      125.   FHC did not merely copy the appearance of CRL's door rail, however;

23  FHC also copied CRL's patented technology as reflected in at least claim 1 of the '413

24  Patent. In fact, each of the Herc-Door™ door rails includes or practices each of the

25  elements of claim 1 of the '413 Patent, and each of the Herc-Door™ door rails infringes

26  at least claim 1 of the '413 Patent literally or under the Doctrine of Equivalents.

27      126.   In particular, the Herc-Door™ door rails use a spring action clamping

28  member that has an open position in which a glass panel can be freely removed and a

closed position that panel to be secured is clamped within the rail body. A screw

engaged in the rail body has an end in contact with the spring action clamping member.

Turning the screw causes the spring action clamping member to move upward, which

causes the upper arms of the spring action clamping member to slide upwardly against

mutually opposed inclined surfaces within the rail body. This upward motion causes the

upper ends of the arms to translate inwardly, applying clamping pressure to each side of

the panel to be secured. Indeed, the Herc-Door™ door rails satisfy each of the elements

of at least claim 1 of the '413 Patent either literally or under the Doctrine of

Equivalents.



127.   As a non-limiting example, CRL presents the following description of the

Herc-Door™ 4-inch tapered door rail taken from FHC's marking materials and

compares it to claim 1 of the '413 Patent. As it is understood and believed that all Herc-

Door™ door rail systems use the same structural elements to clamp a pane of glass, the following contentions are applicable to all Herc-Door™ door rail systems.

(From https://fhc-usa.com/pub/media/bss/productattachment/FHC-R4T34-4-Inch-Tapered-Door-Rail-Submittal.pdf , last visited February 11, 2021.)

128.   Although the preamble of claim 1 is not limiting, the Herc-Door™ door rail system includes a rail assembly for releasably securing a panel, specifically a glass panel, as depicted above, and satisfies the preamble literally and/or under the Doctrine of Equivalents.

129.   The Herc-Door™ door rail system includes a rail body having mutually opposed inclined surfaces, angled inwardly towards the panel to be secured, e.g., the "Dual-Inclined Bearing Surfaces" on each side of the rail body, as described above and below, and satisfies this element literally and/or under the Doctrine of Equivalents.



130.   The Herc-Door™ door rail system also includes a spring action clamping member, having mutually opposed walls, the walls having mutually opposed upper

ends, the upper ends configured to slide against the inwardly inclined surfaces of the rail body. As described above and repeated below, the "Unitizing Clamping Gasket" connects the two arms, and the arms and gasket are in contact with the more darkly shaded support beneath them so as to be a spring action clamping member with upper ends configured to slide against the inwardly inclined surfaces of the rail body, and satisfies this element literally and/or under the Doctrine of Equivalents.



131.   The Herc-Door™ door rail system's spring action clamping member is further movable between an open position wherein the panel to be secured may be freely removed from the rail body and a closed position wherein the panel to be secured

1   is clamped within the rail body. As described above and in a YouTube video that

2   indicates that it was posted by FHC (linked below), the spring action clamping member

3   is movable between an open position that allows a glass panel to be freely inserted or

4   removed and a closed position wherein the panel is clamped within the rail body, and

5   satisfies this element literally and/or under the Doctrine of Equivalents.

6   *See https://youtu.be/ohesbvmPonk?t=13* (last visited February 11, 2021).

7       132.   The Herc-Door™ door rail system has a screw engaged with the rail body

8   having an end in contact with the spring action clamping member, as described above

9   and in the video linked below, and satisfies this element literally and/or under the

10  Doctrine of Equivalents.



23  *See https://youtu.be/ohesbvmPonk?t=13* (last visited February 11, 2021).

24      133.   Moreover, as described above and in the video linked below, actuating the

25  screw in the Herc-Door™ door rail system when it is in an open position results in the

26  screw pressing against the clamping member, causing it to move upwardly. As the

27  spring action clamping member moves upwardly, the upper ends of the mutually

28  opposed walls of the clamping member to slide upwardly against the mutually opposed

46

1  inclined surfaces of the rail body, *e.g.*, the upper mutually opposed inclined surfaces of

2  the depicted "Dual-Inclined Bearing Surfaces." As further depicted above and in the



15  video linked below, this upward motion causes the upper ends to translate inwardly,

16  applying clamping pressure to each side of the panel to be secured. The Herc-Door™

17  door rail system thus satisfies this element literally and/or under the Doctrine of

18  Equivalents.

19  *See https://youtu.be/ohesbvmPonk?t=13* (last visited February 11, 2021).

20      134.   FHC has engaged in the manufacture, use, sale, offer for sale and/or

21  importation of the aforementioned door rail systems in the United States, without the

22  permission, license, or consent of CRL.

23      135.   Upon information and belief, at least all of FHC's Herc-Door™ door rail

24  systems are identical or substantially similar in hardware and architecture to the Herc-

25  Door™ door rail system described above, and they infringe, literally or under the

26  Doctrine of Equivalents, at least claim 1 of the '413 Patent for the reasons set forth

27  above.

28      136.   FHC's infringement has been deliberate and willful, undertaken with full

knowledge of the '413 Patent. Indeed, on information and belief, FHC intentionally copied CRL's door rail designs as well as the technology of at least claim 1 of the '413 Patent to create a door rail product to directly compete with CRL's door rail products. FHC willfully infringed the '413 Patent from the very first time it made, used, offered for sale, imported, and/or sold the Herc-Door™ door rail system. Among other things, FHC knew or should have known that the alleged new design of the Herc-Door™ door rail system copied the technology in at least claim 1 of the '413 Patent because FHC's principals and employees had knowledge of CRL's patented designs, including the '413 Patent's design, and, on information and belief, used that knowledge to design the Herc-Door™ door rail system. Additionally, on information and belief, Sprague himself was involved in the design of the Herc-Door™ door rail system and knew himself that it copied (and therefore infringed) the claimed technology of the '413 Patent.

137.    Additionally or alternatively, FHC has had knowledge that the Herc-Door™ door rail system infringed at least claim 1 of the '413 Patent as of the service date of this Complaint, and has willfully infringed the '413 Patent from at least that date for all of its infringing activities.

138.    FHC is in privity with Sprague, on at least the grounds that Sprague is its employee and FHC has represented that he is FHC's Vice President of Product Design and Development.

139.    On information and belief, FHC further availed itself of Sprague's knowledge and assistance to design, make, use, import, offer for sale, and/or sell the Herc-Door™ door rail systems.

140.    As a result of its relationship and privity with Sprague, FHC is estopped from challenging the validity of the '413 Patent at least by virtue of the doctrine of assignor estoppel.

141.    By reason of their aforementioned acts of infringement, FHC has been unjustly enriched and this is an exceptional case entitling CRL to enhanced damages, an award of its attorneys' fees, and all other relief permitted by the Patent Act.

142.    By reason of FHC's acts of infringement, CRL has suffered damages, including but not limited to, lost profits, and CRL is entitled to recover such lost profits. At a minimum, by reason of the aforementioned acts of infringement, CRL is entitled to recover a reasonable royalty.

143.    By reason of Defendants' acts of infringement, unless enjoined by this Court, CRL will continue to suffer irreparable harm for which there is no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

### Trade Secret Misappropriation—Defend Trade Secrets Act

### (18 U.S.C. §§ 1832, 1836 *et seq.*)

### (Against Defendants FHC and Hanstad)

144.    CRL repeats the allegations set forth above in Paragraphs 1 through 143 as though fully set forth herein in this paragraph.

145.    CRL owns and possesses confidential and trade secret information, as alleged above.

146.    CRL's Confidential Information, which comprises at least Supplier Information, is crucial to the success of its business. Thus, CRL makes substantial efforts to keep this information from its competitors and the public. CRL has taken, at all relevant times, reasonable efforts to maintain the secrecy of its Confidential Information, including by requiring its employees, as a condition of employment, to abide by a strict Code of Conduct forbidding the disclosure, use, or transmission of any CRL Confidential Information, and by requiring that all persons accessing CRL repositories and databases have personalized authentication credentials in order to access such repositories/databases. The measures that CRL takes are reasonable under the circumstances to maintain the information's secrecy.

147.    CRL spent decades identifying, negotiating with, and testing products from over 800 individually selected vendors whose products comprise approximately 75% of CRL's more than 50,000 products. As alleged above, CRL invested substantial

resources in developing its Confidential Information. Such Confidential Information, which comprises the Supplier Information, therefore derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

148. CRL's Confidential Information set forth above constitute trade secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836, *et seq.*, because CRL has taken reasonable measures to maintain the secrecy of such assets and those assets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Among other things, CRL's competitors would obtain economic value from the use and the disclosure of CRL's Confidential Information, including confidential data relating to Supplier Information.

149. FHC and Hanstad misappropriated at least CRL's Supplier Information to source products that they would not otherwise be able to source. Moreover, FHC and Hanstad acquired and/or derived knowledge and custody of CRL trade secrets through improper means—including, without limitation, CRL's confidential Supplier Information—and could not have realistically compiled this information and offered the identical and near-identical products as CRL without the use of CRL's Confidential Information. As such, among other things, FHC and Hanstad misappropriated CRL's trade secret asset in the Supplier Information by engaging in conduct prohibited by 18 U.S.C. §§ 1836, *e.g.*, 1839(5)(A) and(5)(B).

150. Through their unlawful actions, FHC and Hanstad used and/or acquired knowledge and custody of CRL's trade secrets. FHC and Hanstad knew or had reason to know that CRL's Confidential Information was confidential. For example, Hanstad knew that, when he had access to the other Confidential Information while employed by CRL, he had a duty to maintain the secrecy of that information. Hanstad was aware of

the Code of Conduct and employment policies of CRL forbidding the unauthorized access, use, or transmission of the Supplier Information. Additionally, it is well known in the industry that such information (supplier information, vendor lists, and product designs and specifications) are highly valuable and confidential.

151.   FHC and Hanstad used at least CRL's trade secret data described as Supplier Information above, by improper means, as alleged above. For example, with respect to the Supplier Information, Hanstad used and disclosed such information at least by his breaching of his duties to CRL. FHC and Hanstad knew or should have known that they used, acquired, derived and/or disclosed CRL's trade secret information via improper means. Moreover, FHC and Hanstad misappropriated at least CRL's proprietary Supplier Information in interstate commerce to develop and market competitive services and products at CRL's expense and to CRL's detriment.

152.   FHC's and Hanstad's conduct, including but not limited to their knowing and unlawful misappropriation of CRL's trade secrets as alleged above, has caused CRL irreparable injury. Unless restrained and enjoined, FHC and Hanstad will continue to engage in such acts. CRL's remedy at law is therefore inadequate to compensate it for the past and threatened injuries and thus CRL is entitled to injunctive relief as provided for by the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(A). CRL also is entitled to and prays for all other remedies available under the Defend Trade Secret Act, 18 U.S.C. § 1836, including damages pursuant to 18 U.S.C. § 1836(b)(3)(B).

153.   Each of the aforementioned acts was done by FHC and Hanstad willfully and maliciously, with the deliberate intent to injure CRL and with the conscious disregard of CRL's rights, thus entitling CRL to an award of enhanced damages pursuant to 18 U.S.C. § 1836(b)(3)(C). CRL is further entitled pursuant to 18 U.S.C. § 1836(b)(3)(D) to an award of its reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

### Misappropriation of Trade Secrets (Cal. Civ. Code § 3426 *et seq.*)

### (Against Defendants FHC and Hanstad)

154.   CRL repeats the allegations set forth above in Paragraphs 1 through 153 as though fully set forth herein in this paragraph.

155.   CRL owns and possesses confidential and trade secret information, as alleged above.

156.   CRL's Confidential Information, which comprises Supplier Information, is crucial to the success of its business. Thus, CRL makes substantial efforts to keep this information from its competitors and the public. CRL has taken, at all relevant times, reasonable efforts to maintain the secrecy of its Confidential Information, including by requiring its employees, as a condition of employment, to abide by a strict Code of Conduct forbidding the disclosure, use, or transmission of any CRL Confidential Information, and by requiring that all persons accessing CRL repositories and databases have personalized authentication credentials in order to access such repositories/databases. The measures that CRL takes are reasonable under the circumstances to maintain the information's secrecy.

157.   CRL spent decades identifying, negotiating with, and testing products from over 800 individually selected vendors whose products comprise approximately 75% of CRL's more than 50,000 products. As alleged above, CRL invested substantial resources in developing its Confidential Information. Such Confidential Information, which comprises at least the Supplier Information, therefore derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

158.   CRL's Confidential Information, set forth above, constitutes trade secrets pursuant to the California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426.1 *et seq.* As alleged above: CRL has taken reasonable measures to maintain the secrecy of such assets and those assets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use. Among other things, CRL's competitors would obtain economic value from the use and the disclosure of CRL's Confidential Information,

including confidential data relating to at least the Supplier Information.

159.   FHC and Hanstad misappropriated at least CRL's Supplier Information as set forth above—namely, Defendants stole and wrongfully used CRL's Supplier Information to source products that they would not otherwise be able to source. FHC and Hanstad acquired knowledge and custody of CRL trade secrets—including, without limitation, at least CRL's confidential Supplier Information—and could not have compiled this information and offered numerous identical and near-identical products to CRL's without the use of CRL's Confidential Information. As such, among other things, FHC and Hanstad misappropriated CRL's trade secret asset in the Supplier Information by engaging in conduct described above and prohibited by Cal. Civ. Code §3426.1(b).

160.   Through their unlawful actions, FHC and Hanstad used and acquired knowledge and custody of CRL's trade secrets. FHC and Hanstad knew that CRL's Confidential Information, including its Supplier Information, was confidential. For example, Hanstad knew that, when he had access to the other Confidential Information while employed by CRL, he had a duty to maintain the secrecy of that information. Hanstad was aware of the Code of Conduct forbidding the unauthorized access, use, or transmission of Confidential Information. Additionally, it is well known in the industry that such information (supplier information, vendor lists, and product designs and specifications) are highly valuable and confidential.

161.   FHC and Hanstad used and disclosed at least CRL's trade secret data described above as Supplier Information by improper means and without CRL's consent, as alleged above. With respect to the Supplier Information, FHC and Hanstad also used and disclosed such information by at least by Hanstad's breaching of his duties to CRL. FHC and Hanstad knew or should have known that they used, acquired, and disclosed CRL's trade secret information improperly. FHC and Hanstad misappropriated, retained, and/or used proprietary Supplier Information and trade secrets to develop and market a competitive services and products at CRL's expense.

162.   FHC's and Hanstad's conduct, including but not limited to their knowing

and unlawful misappropriation of CRL's trade secrets as alleged above, has caused CRL irreparable injury. Unless restrained and enjoined, FHC and Hanstad will continue to engage in such acts. CRL's remedy at law is therefore inadequate to compensate it for the past and threatened injuries and thus CRL is entitled to injunctive relief as provided for by Cal. Civ. Code §3426.2. CRL also is entitled to and prays for all other remedies available Cal. Civ. Code §3426.1 *et seq.*, including damages pursuant to Cal. Civ. Code §3426.3(a).

163.   FHC's and Hanstad's misappropriation of trade secrets were done willfully and with oppression, fraud, and malice as defined Cal. Civil Code § 3294(c). Among other things, FHC and Hanstad were aware of the obligation to maintain the confidentiality of CRL's Confidential Information, but nevertheless intentionally used the Supplier Information with the intent to injure CRL. Such conduct justifies an award of punitive and exemplary damages pursuant to Cal. Civ. Code § 3294. For the reasons stated—because FHC and Hanstad engaged in such conduct willfully and maliciously and with the conscious disregard of CRL's rights, CRL is also entitled to an award of its reasonable attorneys' fees pursuant to Cal. Civ. Code § 3426.4.

## SIXTH CLAIM FOR RELIEF

### Violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a))

### (Against Defendant FHC)

164.   CRL repeats the allegations set forth above in Paragraphs 1 through 163 as though fully set forth herein in this paragraph.

165.   After acquiring illicit design documentation from the Protected Computer Program(s) as set forth above, Dorado and FHC scrubbed CRL-branding and other CRL-related information from the documentation and repackaged the documentation with FHC branding and other information to make it appear as if the documentation was a native FHC document.

166.   FHC's wholesale copying and misappropriation of the documentation generated by the Protected Computer Programs, including but not limited to the

documentation generated on November 4, 2020, represents the misattribution and misrepresentation of CRL's work (and the resulting products and services offered to its customers) as FHC's services for FHC's gain, confusing consumers as to the true origin of the documentation and services represented thereby.

167.    FHC's distribution of the documentation generated by the Protected Computer Programs with misattribution to FHC—including but not limited to with respect to the documentation generated on November 4, 2020—and FHC's offering for sale and sale of goods and services in connection with such documentation, are likely to cause confusion, or to cause mistake, or to deceive as to the origin of documentation, in that purchasers are likely to believe that CRL's high quality services are, instead, attributable to FHC. Defendants' acts as alleged herein, including "reverse passing off" of the documentation generated by the Protected Computer Programs as FHC's own, are unlawful under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), and constitute false designation of origin and unfair competition in violation of Lanham Act section 43(a), 15 U.S.C. § 1125(a).

168.    CRL is entitled to damages in an amount to be proven at trial.

169.    At all times, FHC's violations of Section 43(a) of the Lanham Act were knowing, deliberate, willful, fraudulent, and without extenuating circumstances. FHC's willful violations of Lanham Act Section 43(a) are the direct and proximate cause of harm to CRL, and CRL is entitled to recover three times the amount of actual damages or profits, and attorneys' fees on the basis that this case is exceptional and costs incurred in this action and the disgorgement of all of FHC's profits pursuant to 15 U.S.C. § 1117(a).

170.    FHC's conduct, including but not limited to their violation of Section 43(a) of the Lanham Act as alleged above, has caused CRL irreparable injury for which CRL has no adequate legal remedy. Unless restrained and enjoined, FHC will continue to engage in such acts. CRL's remedy at law is therefore inadequate to compensate it for the past and threatened injuries and thus CRL is entitled to injunctive relief pursuant to

at least 15 U.S.C. § 1116(a).

## SEVENTH CLAIM FOR RELIEF

### Common Law Unfair Competition

### (Against Defendant FHC)

171.   CRL repeats the allegations set forth above in Paragraphs 1 through 170 as though fully set forth herein in this paragraph.

172.   CRL has invested significant time and millions of dollars in the co-development of, and in maintaining and protecting, the proprietary Protected Computer Programs and the documentation that they generate.

173.   Defendant FHC illegally accessed and used CRL's Protected Computer Programs to design and sell a product to Hartung and thereby appropriated and used the Protected Computer Programs at no cost. See Exhibit C. After acquiring the illicit design documentation from at least the Storefronts Online program, FHC then tried to pass off the source of the design and schematics by scrubbing CRL-branding and other CRL-related information from the documentation and inserting in its place FHC branding and other information to make it appear as if the documentation was a native FHC document. CRL did not authorize or consent to FHC's use of the Protected Computer Programs or FHC's passing off of the documentation generated by the Programs.

174.   FHC falsely and wrongfully incorporated FHC's branding and other information to make it appear as if the documentation was a native FHC document without attributing such documentation to its true originator and owner, CRL. FHC then provided that documentation to Hartung, causing deception among consumers as well as falsely representing that FHC was the true creator of the documentation. On information and belief, this was not the only time FHC wrongfully passed off documentation created by unlawfully accessing and using CRL's Protected Computer Programs.

175.   FHC has unlawfully, unfairly, and deceptively engaged in practices violating California law, including but not limited to, passing off the documentation

generated by the Protected Computer Programs to make it appear as if the documentation was a native FHC document. Such conduct, including but not limited to with respect to the documentation generated on November 4, 2020, creates a likelihood of confusion as to the source of the documentation and services it represents. FHC's acts are a violation of California common law unfair competition.

176.   As a result of FHC's conduct set forth above, CRL has suffered and will continue to suffer competitive injury including, but not limited to, damage to its business, reputation, and goodwill.

177.   Upon information and belief, FHC profited from its misconduct set forth above, including by receiving revenue and by obtaining non-monetary goodwill with customers as a result of the use of the Protected Computer Programs, which thereby diminished the value of the programs. As such, FHC has been unjustly enriched by its misconduct to the detriment and expense of CRL. It would be unjust for FHC to retain this benefit and FHC should not be permitted to reap the benefits of its wrongful misconduct.

178.   CRL has no adequate remedy at law and, if FHC's actions are not enjoined, CRL will continue to suffer irreparable harm.

179.   FHC's violation of California unfair competition law was done willfully and with oppression, fraud, and malice as defined Cal. Civil Code § 3294(c). Such conduct justifies an award of punitive and exemplary damages pursuant to Cal. Civ. Code § 3294.

## EIGHTH CLAIM FOR RELIEF

### Fraud

### (Against Defendants FHC, Dorado, And Sutherland)

180.   CRL repeats the allegations set forth above in Paragraphs 1 through 179 as though fully set forth herein in this paragraph.

181.   FHC, Dorado and Sutherland represented to CRL that they were a legitimate, paying subscriber of CRL's Protected Computer Programs when they

accessed, or caused to be accessed, the Storefronts Online program and other programs as alleged herein. Specifically, each time they signed on to the program using the password of a specific individual from Glasswerks, each of FHC, Dorado and Sutherland represented they were that individual with legitimate credentials.

182.   As admitted in the document provided by FHC in response to this Court's Order granting CRL's motion for a preliminary injunction [Dkt. No. 46], FHC, Dorado, and Sutherland signed on to CRL's Protected Computer Programs on numerous occasions making the same type of representation: namely, that they were an individual from Glasswerks with legitimate credentials to log in to and use the Protected Computer Programs. As admitted in the document provided by FHC in response to this Court's Order granting CRL's motion for a preliminary injunction [Dkt. No. 46], Sutherland signed on to and used CRL's Protected Computer Programs—specifically Storefronts Online, and thus made unauthorized access and made the same type of representation that he was an individual from Glasswerks with legitimate credentials to log in to and use the Storefronts Online program, on at least the following 19 separate occasions:

- December 8, 2020
- December 18, 2020
- December 18, 2020
- December 18, 2020
- December 21, 2020
- December 22, 2020
- December 28, 2020
- December 30, 2020
- January 11, 2021
- January 12, 2021
- January 12, 2021
- January 14, 2021
- January 15, 2021

THIRD AMENDED COMPLAINT

- January 15, 2021
- January 16, 2021
- January 18, 2021
- January 19, 2021
- January 20, 2021
- February 5, 2021

183.   In every instance when FHC, Dorado, and Sutherland represented that they were an individual from Glasswerks by accessing, or causing to be accessed, CRL's Protected Computer Programs using a password of Glasswerks—including Sutherland's 19 representations set forth above, those representations were false.

184.   FHC, Dorado, and Sutherland knew that their representations to CRL were false when they made them.  This includes each of the 19 separate representations that Sutherland made as outlined above.

185.   When they accessed or caused to be accessed CRL's Protected Computer Programs, FHC, Dorado, and Sutherland intended CRL to rely on the representation that FHC and Dorado were from Glasswerks with a legitimate use of a password. Indeed, the sole reason FHC, Dorado, and Sutherland used the passwords of Glasswerks was to induce CRL to rely on the misrepresentation regarding the user of the Protected Computer Programs.

186.   CRL reasonably relied on the misrepresentations of FHC, Dorado, and Sutherland in granting them access to the Protected Computer Programs based on their misrepresentation that they were from Glasswerks.

187.   CRL was harmed by FHC's, Dorado's and Sutherland's misrepresentations. Among other things, FHC, Dorado and Sutherland used the Protected Computer Programs to engage in sales and/or commercial activity that competed with CRL; CRL also incurred costs to respond to FHC's, Dorado's, and Sutherland's illegal access into the Protected Computer Programs and to address any impairment to the integrity of the system.

188.   CRL's reliance on FHC's, Dorado's, and Sutherland's misrepresentations was a substantial factor in causing CRL's harm.

189.   FHC's, Dorado's, and Sutherland's fraud as alleged above has caused CRL irreparable injury. Unless restrained and enjoined, FHC, Dorado, and Sutherland will continue to engage in such acts. CRL's remedy at law is therefore inadequate to compensate it for the past and threatened injuries and thus CRL is entitled to injunctive relief. CRL also is entitled to and prays for damages.

190.   FHC's, Dorado's, and Sutherland's frauds were done willfully and with oppression, fraud, and malice as defined Cal. Civil Code § 3294(c). Among other things, FHC and its officers, including Sutherland, as well as Dorado, by virtue of their previous employment with CRL, knew the Storefronts Online program, the Showers Online program, and the Hand Rails Online program were password protected, were strictly reserved for use to only licensees who properly subscribed to the program, and were not services that were provided to CRL's competitors. Notwithstanding this knowledge, FHC, Dorado, and Sutherland intentionally masked their conduct by using a password of another and intentionally and fraudulently used CRL's confidential and proprietary software to facilitate the creation of products that were then sold in competition with CRL. Such conduct justifies an award of punitive and exemplary damages pursuant to Cal. Civ. Code § 3294.

## NINTH CLAIM FOR RELIEF

### (Breach of Contract)

### (Against Defendant Glasswerks)

191.   CRL repeats the allegations set forth above in Paragraphs 1 through 190 as though fully set forth herein in this paragraph.

192.   Prior to Glasswerks' and Steinberg's transferring to FHC and its employees passwords that were licensed to Glasswerks for the Storefronts Online Program, the Showers Online Program, and the Hand Rails Online Program, Glasswerks entered into a license agreement with CRL for each of those programs. Each of those license

agreements provided, among other things, that Glasswerks would pay a fee for the program and would obtain certain limited permission to use the programs. Among other things, the license agreements for each of the programs expressly prohibited Glasswerks from providing its password credentials to other persons.

193.   CRL has performed all of its obligations under the contract except for those, if any, from which it was legally excused or frustrated or which were waived or excused by prior material breaches of Glasswerks.

194.   Without justification, by engaging in the acts alleged, Glasswerks breached its obligations under the agreements.

195.   As a proximate result of Glasswerks' breaches of contract, CRL has suffered general, special, and consequential damages in an amount to be proven at trial. CRL seeks compensation for all damages and losses proximately caused by the breach(es).

## TENTH CLAIM FOR RELIEF

### Intentional Interference with Contract

### (Against Defendant FHC)

196.   CRL repeats the allegations set forth above in Paragraphs 1 through 195 as though fully set forth herein in this paragraph.

197.   At all relevant times, Defendant FHC was aware of the existence of the valid and binding agreements between CRL and Glasswerks for each of the Protected Computer Programs, which Agreements provided for the licensing to Glasswerks the right to use the Protected Computer Programs for Glasswerks' use. As set forth above, Defendant FHC was aware that the Agreements between Glasswerks and CRL prohibited Glasswerks from sharing passwords for the Protected Computer Programs. Defendant FHC was aware of the existence of the Agreement and its terms.

198.   Defendant FHC engaged in conduct which prevented Glasswerks'

performance of the contract; namely, Steinberg's transferring of passwords and FHC's use of the Protected Computer Programs with those passwords resulted in Glasswerks' failure to perform its licensing agreements according to its terms.

199.   FHC intended to disrupt the performance of the contract or knew that disruption of performance was certain or substantially certain to occur.

200.   These acts by Defendant FHC have caused and continue to cause CRL to suffer economic damages proximately caused by the intentional interference.

201.   These acts by Defendant FHC were done willfully and with oppression, fraud, and malice as defined Cal. Civil Code § 3294(c). Among other things, FHC and its officers, by virtue of their previous employment with CRL, knew the Storefronts Online program, the Showers Online program, and the Hand Rails Online program were password protected, were strictly reserved for use to only licensees who properly subscribed to the program, and were not services that were provided to CRL's competitors. Notwithstanding this knowledge, FHC intentionally masked its conduct by using a password of another and intentionally and fraudulently used CRL's confidential and proprietary software to facilitate the creation of products that were then sold in competition with CRL. Such conduct justifies an award of punitive and exemplary damages pursuant to Cal. Civ. Code § 3294.

## ELEVENTH CLAIM FOR RELIEF

### Unjust Enrichment And Restitution

### (Against Defendant FHC)

202.   CRL repeats the allegations set forth above in Paragraphs 1 through 201 as though fully set forth herein in this paragraph.

203.   FHC's unlawful conduct as detailed herein, including but not limited to, its illegal intrusions into CRL's Protected Computer Programs for the purpose of (and with the effect of) unlawfully competing with CRL and trading off of CRL's investments in its technology, unjustly enriched FHC at the expense of CRL. FHC received these benefits through fraud and/or coercion, as detailed herein.

204.   FHC also received unjust and unlawful benefits from trading off of and using CRL's intellectual property, including product designs and patent rights, to design its own competing products, including but not limited to the Herc-Door product accused of infringement in this lawsuit.

205.   On information and belief, among the unlawful benefits received by FHC was the opportunity to file its own patents based on door rail designs that it had copied from CRL and confidential technical information that was received and/or developed by its employees while they were working for CRL, including but not limited to its employee, Gary Sprague. FHC received these benefits through fraud and/or coercion, as detailed herein.

206.   CRL has been damaged as a result of FHC's wrongful actions and FHC's unjust enrichment to CRL's detriment.

207.   FHC should be required to disgorge its unjust enrichments, provide restitution to CRL, and a constructive trust should be imposed for CRL's benefit on all intellectual property rights, including patent applications and patents, unjustly acquired by FHC.

## TWELFTH CLAIM FOR RELIEF

### Violation of Business and Professions Code § 17200

### (Against all Defendants)

208.   CRL repeats the allegations set forth above in Paragraphs 1 through 207 as though fully set forth herein in this paragraph.

209.   California Business and Professions Code section 17200 prohibits unfair, unlawful, and fraudulent business acts and practices.

210.   The aforementioned acts of Defendants, including, but not limited to, their violation of the Computer Fraud and Abuse Act and California's Comprehensive Computer Data Access and Fraud Act, their violation of the Defend Trade Secrets Act and California's Uniform Misappropriation of Trade Secret Act, their violation of the

United States Patent Act, their violation of the Lanham Act, and their various breaches of duties and torts to CRL were all made for the purpose of gaining an unfair competitive advantage over CRL and constitute unfair, unlawful, and fraudulent business acts and practices in violation of California Business and Professions Code section 17200 *et. seq.*

211.   As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent business acts and practices, CRL has suffered, and will continue to suffer in an amount in excess of the jurisdictional limits of this Court and in an amount to be proven at trial. Defendants have been unjustly enriched and have reaped benefits as a result of their wrongful conduct, and CRL is entitled to disgorgement and restitution.

212.   Additionally, CRL has suffered and will continue to suffer irreparable harm. Pursuant to California Business and Professions Code sections 17203 and 17204, CRL is entitled to preliminary and permanent injunctive relief enjoining Defendants, and individuals and entities acting with them, from engaging in further conduct constituting unfair, unlawful or fraudulent business acts and practices.

## PRAYER FOR RELIEF

WHEREFORE, CRL prays that the Court:

1.   Enter judgment in favor of CRL and against Defendants on all Claims for Relief;

2.   Order Defendants to pay CRL the damages CRL sustained as a result of Defendants' unlawful acts, including all damages available under statute, common law, and/or in equity;

3.   Order Defendants to account for and disgorge to CRL all gains, profits, and savings derived from their wrongful conduct, including to preclude Defendants' unjust enrichment and award all such unjust enrichment to CRL;

4.   Issue an Order of restitution and impose a constructive trust in favor of CRL on all assets, technology and intellectual property unlawfully taken from it;

5.   Issue an Order pursuant to 18 U.S.C. § 1030(g) and Cal. Penal Code §

502(e) awarding compensatory damages and, including based upon the inherent power of the Court, preliminarily and permanently enjoining FHC, Sutherland, and Dorado and all persons or entities acting with them from directly or indirectly taking the following actions:

(a) Accessing any of CRL's Protected Computer Programs;

(b) Retrieving, copying, transmitting or disseminating any data, documents, or property taken from or belonging to CRL, including from CRL's Protected Computer Programs; and,

(c) Destroying, altering, erasing, or otherwise modifying, or causing or permitting anyone else to destroy, alter, erase, or otherwise modify, any of CRL's data, documents, or property taken from or belonging to other evidence relating to this action or any of Dorado's, Sutherland's, or FHC's or FHC employees' data, documents, or property—whether owned or rented—that contains any evidence relating to the conduct alleged herein;

CRL further prays that the Court, as part of its injunctive order pursuant to 18 U.S.C. § 1030(g) and Cal. Penal Code § 502(e) and the inherent power of the Court, direct FHC, Dorado, and Sutherland and all persons acting with them to identify under oath:

(a) Each and every instance that Defendants accessed CRL's Protected Computer Programs, including with documentary evidence and every piece of electronic data (weblog data, including with name, hash marks or other identifying means);

(b) Each and every instance that Defendants removed/copied from CRL's Protected Computer Programs any data;

(c) The location of all files and copies of files and other data that Defendants accessed or removed from CRL;

(d) All electronic storage devices (including but not limited to home

computers, thumb drives, CDs, hard drives, private email accounts, and other media capable of storing electronic data) in Defendants' possession that was used in connection with accessing CRL's Protected Computer Programs; Defendants must preserve all such devices for purposes of allowing a third party expert to forensically image and preserve the data on these devices so that it can be inspected; and

(e) (e) Each and every individual who made access to CRL's Protected Computer Programs;

6.   Issue an Order declaring that FHC has infringed and currently is infringing the '413 Patent, and, further:

a.   Declaring that FHC's infringement has been willful;

b.   Preliminarily and permanently enjoining FHC from making, using, selling, offering to sell, or importing into the United States, the products found to infringe the '413 Patent and any colorably indistinct products;

c.   Awarding CRL damages sufficient to compensate for FHC's infringement, including lost profits, but in an amount no less than a reasonable royalty, and that such damages be trebled pursuant to 35 U.S.C. § 284;

d.   Declaring this case exceptional and awarding CRL all attorneys' fees awardable under 35 U.S.C. § 285; and

e.   Awarding CRL all such other relief allowed by law or equity;

7.   Issue an Order permanently enjoining FHC from engaging in unfair competition pursuant to 15 U.S.C. § 1116, and award CRL its actual compensatory damages and FHC's profits pursuant to 15 U.S.C. § 1117 in an amount to be determined at trial; and, issue an Order that FHC pay CRL treble damages, and award CRL its reasonable attorneys' fees and all other available relief pursuant to 15 U.S.C. § 1117;

8.   Issue an Order pursuant to Cal. Civil Code § 3426.2(a) and the inherent power of the Court preliminarily and permanently enjoining FHC and Hanstad and all

persons or entities acting with them from directly or indirectly taking the following actions:

 (a) Accessing, using, retaining, or disclosing any of CRL's Confidential Information, including Supplier Information and data, documents, or property taken from or belonging to CRL;

 (b) Retrieving, copying, transmitting, or disseminating any copies of CRL's Confidential Information, including Supplier Information and data, documents, or property taken from or belonging to CRL; and

 (c) Destroying, altering, erasing, or otherwise modifying, or causing or permitting anyone else to destroy, alter, erase, or otherwise modify, any of CRL's Confidential Information, including data, documents, or property taken from or belonging to other evidence relating to this action;

 CRL further prays that the Court, as part of its injunctive order pursuant to Cal. Civil Code § 3426.2(a) and the inherent power of the Court, direct FHC and Hanstad and all persons acting with them to identify under oath:

 (a) Each and every file and piece of electronic data (by name, hash marks or other identifying means) they accessed and/or removed/copied from CRL's premises or CRL's electronic storage devices;

 (b) The location of all files and copies of files FHC and Hanstad accessed or removed from CRL's premises or CRL's electronic storage devices;

 (c) All electronic storage devices (including but not limited to home computers, thumb drives, CDs, hard drives, private email accounts, and other media capable of storing electronic data) in FHC's and Hanstad's possession, custody, or control, for purposes of allowing a third party expert to forensically image and preserve the data on these devices so that it can be inspected; and

 (d) Those individuals who have been given access to (and what use has

been made of) the data FHC and Hanstad removed from CRL;

9.      Order Defendants to pay CRL exemplary damages pursuant to Cal. Civil Code § 3426.3(c) in an amount equal to twice the amount awarded under Cal. Civil Code § 3426.3(a) and/or (b);

10.     Order FHC and Hanstad pursuant to Cal. Civil Code § 3426.4 and the inherent power of the Court to pay CRL's attorneys' fees incurred in this action and all other costs of the action;

11.     Award punitive and exemplary damages pursuant to Cal. Civ. Code § 3294 and/or common law or equity, including as to FHC and Dorado pursuant to Cal. Penal Code § 502, based on Defendants' malicious, willful, and oppressive conduct;

12.     Order Defendants to pay pre- and post-judgment interest at the maximum legal rate as an element of damages that CRL has suffered as a result of Defendants' wrongful and illegal acts;

13.     Award all costs, fees and expenses as provided by statute, common law or equity; and,

14.     Order all such other and further relief as this Court deems just and proper.

THIRD AMENDED COMPLAINT

Dated:  March 4, 2022                                 **BARNES & THORNBURG LLP**


By: *[s/Seth A. Gold]*
        DAVID C. ALLEN
        PETER MORRIS
        SETH A. GOLD
        GARRETT S. LLEWELLYN
        JONATHAN J. BOUSTANI
        AMY C. POYER

        **BARNES & THORNBURG LLP**
        JEFF M. BARRON (*pro hac vice*)
        jeff.barron@btlaw.com
        11 South Meridian Street
        Indianapolis, IN 46204
        Telephone:   (317) 236-1313
        Facsimile:   (317) 231-7433

        Attorneys for Plaintiff
        C.R. LAURENCE CO., INC.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff C.R. Laurence Co., Inc. demands a trial by jury on all matters herein so triable.

Dated:  March 4, 2022                 **BARNES & THORNBURG LLP**


By:*/s/Seth A. Gold*
     DAVID C. ALLEN
     PETER MORRIS
     SETH A. GOLD
     JEFF M. BARRON
     GARRETT S. LLEWELLYN
     JONATHAN J. BOUSTANI
     AMY C. POYER

     Attorneys for Plaintiff
     C.R. LAURENCE CO., INC.

THIRD AMENDED COMPLAINT